**Michael Lee FULLWOOD,
Petitioner–Appellant,**

v.

**R.C. LEE, Warden of Central Prison,
Raleigh, North Carolina,
Respondent–Appellee.**

No. 01–13.

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 22, 2002.

Decided May 21, 2002.

---

**ARGUED:** Kenneth Justin Rose, Center for Death Penalty Litigation, Inc., Durham, North Carolina, for Petitioner–Appellant. Teresa Harris Pell, Special Deputy Attorney General, North Carolina Department of Justice, Raleigh, North Carolina, for Respondent–Appellee. **ON BRIEF:** Stephen P. Lindsay, Cloninger, Lindsay, Hensley, Searson & Arcuri, P.L.L.C., Asheville, North Carolina, for Petitioner–Appellant. Roy Cooper, Attorney General of North Carolina, North Carolina Department of Justice, Raleigh, North Carolina, for Respondent–Appellee.

Before WIDENER, MICHAEL, and TRAXLER, Circuit Judges.

Affirmed in part, reversed in part, dismissed in part, and remanded by published opinion. Judge TRAXLER wrote the majority opinion, in which Judge MICHAEL joined. Judge WIDENER wrote an opinion concurring in part and dissenting in part.

## OPINION

TRAXLER, Circuit Judge.

A North Carolina state court sentenced Michael Lee Fullwood to die for the murder of Deidre Waters. Fullwood appeals an order of the district court denying his petition for a writ of habeas corpus. *See* 28 U.S.C.A. § 2254 (West 1994 & Supp. 2001).[1] Fullwood raises a number of claims, but his primary contention is that he was deprived of a fair trial because the jury was subjected to improper third party communications and the jury considered prejudicial factual information that was not in evidence. With respect to his Sixth Amendment claim based on the alleged improper jury contact and improper consideration of facts not in evidence, we conclude that Fullwood "has made a substantial showing of the denial of a constitutional right." 28 U.S.C.A. § 2253(c)(2) (West Supp.2001). We grant his application for a certificate of appealability on those issues, and we reverse the decision of the district court only to the extent that the district court denied Fullwood's request for an evidentiary hearing as to whether one of the jurors was improperly influenced by her husband and whether the jury improperly learned that Fullwood had already been sentenced to death for this murder in a previous capital sentencing proceeding, so as to deny Fullwood a fair trial. We affirm the remainder of the district court's disposition of that claim.

With respect to the other claims, we conclude that the state court's refusal to grant relief was neither contrary to, nor an unreasonable application of, clearly established federal law as decided by the Supreme Court. We deny Fullwood's application for a certificate of appealability with respect to his other claims and dismiss them. Accordingly, we affirm in part, reverse in part, dismiss in part and remand.

## I.

Fullwood and Deidre Waters were romantically involved for three and one-half years, and Fullwood was the father of Deidre's child Michelle. In March 1985, the relationship between Fullwood and Deidre became strained, and Fullwood eventually began threatening to kill Deidre.

On March 29, 1985, Deidre went to the home of Michael and Camille Hawks where Deidre was employed as a day care worker. The North Carolina Supreme Court summarized the events which occurred next and the evidence introduced during the guilt phase of trial as follows:

> At 8:20 a.m. Ms. Mills [Deidre's mother] dropped Deidre off at the Hawks' residence. While Ms. Hawks was still at home, Deidre received calls from defendant's mother and from defendant. Deidre told defendant's mother that she had taken out the warrant because she was tired of defendant threatening to cut her head off and to cut her heart out. Ms. Hawks left her home around 8:30 a.m.
>
> At 9:30 a.m. Robin Ferrell arrived at the Hawks' home to leave her child at the day care center. She went to the front door, found the door locked, and

---

1. The amendments to § 2254 effected by § 104 of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104–132, 110 Stat. 1214, apply to this case.

began knocking. When there was no answer, she went to the front window. The window was broken. She saw blood in the house and heard the children crying. Ms. Ferrell phoned Mr. Hawks from a neighbor's house; she then returned to the Hawks' home, coaxed the children to the window, and lifted them out. The children told her that Deidre was sleeping on the floor and that a man was sleeping on the floor with her.

When Mr. Hawks arrived, he and Ms. Ferrell went into the house. They found Deidre on the living room floor with her head against the base of the couch. She had no pulse and her eyes were open, dilated and glassy. Her neck was "severely cut," and her chest was "completely covered with blood." Defendant lay across her legs with his head near her lap. When Mr. Hawks pulled defendant off Deidre, defendant moaned and moved around. Mr. Hawks moved a knife, which was near defendant, to the foyer. He and Ms. Ferrell went outside to wait for the police.

At 10:00 a.m. medical personnel arrived and attempted to give first aid to defendant, who had a wound in his stomach and wounds on his neck and arms. Defendant fought with them. When they got him on the stretcher, he said, "Don't stab me anymore, don't stab me anymore." The paramedic who put defendant in the ambulance expressed the opinion that defendant was not in shock at that time.

Sergeant Ted Lambert and Detective Walt Roberson of the Asheville Police Department arrived at the scene at 10:10 a.m. Sergeant Lambert noticed the broken window and blood on the floor in the foyer. They found the bloody knife which Mr. Hawks had moved lying in the foyer. Deidre was lying on the living room floor with blood on her clothing, underneath her and throughout the living room. The paramedics were treating defendant. They found blood in the sitting room, on the outside of the first floor bathroom door and on the walls, mirror and commode in the bathroom. The bathroom door appeared to have been forced open. In the dining room they found defendant's grey jacket, pieces of the broken window glass, and the plastic from the window covering. The cord of the dining room telephone had been pulled from the jack, and the receiver lay on the floor. There was blood on the jacket, the window glass and plastic, the phone receiver, the walls and the floor.

In the kitchen they found blood on the floor, the counter, and the refrigerator. A bloody butcher knife with defendant's palm print on it lay on the kitchen counter, and a steak knife with traces of blood on it lay under the high chair. There was also blood on the stairway and on the upstairs phone.

Lieutenant William Gibson of the Asheville Police Department took blood scrapings from many areas in the house. The tests revealed that the blood on the butcher knife was consistent with that of defendant and Deidre, the blood on the knife in the foyer was defendant's, and the steak knife did not have enough blood on it that the source of the blood could be traced. The blood throughout the house was consistent with that of either defendant or Deidre.

The autopsy on Deidre's body disclosed twenty-four significant wounds, most of which were slash wounds. Two of the wounds were capable of causing death: a deep slashing wound on her neck which cut her carotid artery, and a penetrating wound on her anterior chest which went into her right lung. Dr. George Lacy, the pathologist, testified that Deidre could have survived from

fifteen to forty-five minutes after receiving the fatal wounds. The Chief Medical Examiner, Dr. Page Hudson, testified that, in his opinion, she died within a few minutes after receiving these wounds.

Dr. Frank Edwards, an emergency room doctor, testified that defendant was in shock when he was admitted to the hospital. Dr. Joseph Noto, the surgeon who treated defendant, testified that defendant had a series of parallel superficial cuts on his wrists and neck. He had a stab wound in his abdomen. Dr. Noto opined that because the wounds were straight and precise, the neck, wrist and abdomen wounds were all self-inflicted. Dr. Hudson agreed that the wrist and neck wounds were self-inflicted and said that it was "more likely than not" that the abdominal wound was self-inflicted, although "it could have been inflicted by someone else."

Grover Matthews, a police detective, testified that while defendant was in the emergency room he said that his girlfriend had stabbed him. The trial court did not allow this statement into evidence.

From the circumstantial evidence, the State developed the theory that defendant broke the dining room window and came into the house. Deidre, who was trying to phone for help, tried to keep him out. Defendant went to the kitchen and got the butcher knife. Deidre ran to the bathroom and locked herself in, but defendant forced the door open and began stabbing her. She managed to get away and ran into the living room, where he caught her and inflicted the fatal wounds. He then selected a smaller knife from the kitchen and inflicted wounds upon himself.

The defense conceded that defendant had killed Deidre and asked for a verdict of guilty of second degree murder. Defense counsel argued that defendant was in an emotional turmoil, was stabbed in the stomach by Deidre, and did not premeditate or deliberate regarding the killing. Defense counsel presented several character witnesses for defendant. A clinical correctional psychologist testified to defendant's low IQ and opined that defendant's relationships with Deidre and Michelle were "the foundation of his life" and that he could not deal with his perception that Deidre was leaving him and taking Michelle with her.

*State v. Fullwood*, 323 N.C. 371, 373 S.E.2d 518, 522–24 (N.C.1988) (*"Fullwood I"*), *vacated*, 494 U.S. 1022, 110 S.Ct. 1464, 108 L.Ed.2d 602 (1990).

The jury was instructed on first degree murder on the basis of pre-meditation and deliberation, as well as second degree murder. The jury found Fullwood guilty of first degree murder.

Fullwood's trial then proceeded to the sentencing phase, where the jury determined that the State had proven the aggravating circumstance that the murder was especially heinous, atrocious and cruel. *See* N.C. Gen.Stat. § 15A–2000(e)(9). In turn, the jury concluded that there were seven mitigating circumstances present.[2]

---

**2.** These were as follows: (1) the murder was committed while defendant was under the influence of a mental or emotional disturbance; (2) defendant's immaturity or limited mental capacity at the time of the commission of the offense; (3) defendant sought the assistance of vocational rehabilitation to prepare himself for better employment; (4) defendant sought the assistance of the Human Resources Development Program of a technical college to prepare himself for better employment; (5) defendant has tried to maintain employment despite limited abilities; (6) defendant

The jury ultimately determined that the mitigating circumstances were not sufficient to outweigh the aggravating circumstance and recommended that Fullwood's sentence be fixed at death.

The Supreme Court of North Carolina affirmed Fullwood's conviction and sentence on direct appeal. *See id.* at 539. The United States Supreme Court, however, vacated Fullwood's sentence, *see Fullwood v. North Carolina,* 494 U.S. 1022, 110 S.Ct. 1464, 108 L.Ed.2d 602 (1990), and remanded for the North Carolina Supreme to reconsider Fullwood's sentence in light of *McKoy v. North Carolina,* 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990). On remand, the North Carolina Supreme Court held that, under *McKoy,* the jury had been improperly instructed during the sentencing phase that it was required to find the existence of a mitigating circumstance unanimously before such circumstance could be considered by any juror. *See State v. Fullwood,* 329 N.C. 233, 404 S.E.2d 842, 843 (N.C.1991) (*"Fullwood II"*). The court determined that the sentencing error was not harmless and remanded for a new capital sentencing proceeding. *See id.* at 845.

At resentencing, the State again submitted the "especially heinous, atrocious, and cruel" aggravating factor to the jury. The jury concluded unanimously that this aggravating factor was present.

As did the original jury, the jury on resentencing determined that several mitigating circumstances were present as well: Fullwood committed the murder "while . . . under the influence of mental or emotional disturbance"; "[a]t the time of the murder . . . [Fullwood] suffered from alcohol and substance abuse"; Fullwood did not have a conviction for "any felony in-

volving violence" prior to the date of the murder; Fullwood did not have a conviction for "any crime involving violence to another person" prior to the date of the murder; Fullwood's father abused alcohol and physically abused his mother; Fullwood "has not received any disciplinary actions or write-ups in the nine and one-half years since he has been incarcerated"; Fullwood "has been a model inmate at Central Prison"; Fullwood "has consistently acted in a mature, responsible manner when dealing with prison personnel"; Fullwood "has shown determination in pursuing his G.E.D., despite borderline intellectual functioning"; Fullwood "has grown and matured spiritually in his religious faith since he has been at Central Prison"; and Fullwood "has shown the capacity to continue to adjust well to prison life." J.A. 145–47. The jury also found the fact that Fullwood suffered race-related violence at a young age to be of mitigating value.

The jury also rejected a number of mitigating circumstances submitted by the defense: that Fullwood "has no significant history of prior criminal activity"; that Fullwood's capacity "to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired"; that Fullwood "had limited mental capacity at the time of the offense"; that Fullwood's IQ was within the "borderline range of intellectual functioning"; that the murder was committed with "knives which were already at the scene and not brought" by Fullwood; and that Fullwood "has expressed remorse and sorrow for what he has done." J.A. 145–47.

The jury found beyond a reasonable doubt that the mitigating circumstances

expressed remorse and sorrow for what he had done; and (7) the offense was committed by means of a weapon or weapons

acquired at the Hawks' residence and not taken there by defendant.
*Fullwood I,* 373 S.E.2d at 524.

failed to outweigh the aggravating circumstance and that the aggravating circumstance was sufficiently substantial to support the imposition of a death sentence. Following the jury's recommendation, the state court imposed a sentence of death. Fullwood appealed his sentence to the North Carolina Supreme Court, which affirmed. *See State v. Fullwood,* 343 N.C. 725, 472 S.E.2d 883 (N.C.1996) (*"Fullwood III "*). The United States Supreme Court denied Fullwood's petition for a writ of certiorari.

Fullwood then filed a Motion for Appropriate Relief ("MAR") in Buncombe County Superior Court, seeking post-conviction relief. The court issued an order denying Fullwood's requested relief and determined that an evidentiary hearing was unnecessary. Fullwood sought review of the state trial court's denial of his MAR by petitioning the North Carolina Supreme Court for a writ of certiorari. His petition was denied. *See State v. Fullwood,* 349 N.C. 234, 516 S.E.2d 599 (N.C.1998).

Fullwood next petitioned for relief in district court pursuant to section 2254. The district court granted the State's motion for summary judgment on each of Fullwood's claims and concluded that the issues raised by Fullwood did not require a hearing.

Fullwood now appeals, raising five grounds for relief. Because each of these claims was adjudicated on the merits in state court, we apply a deferential standard of review: whether "the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C.A. § 2254(d)(1). The Supreme Court has explained that a state court decision is "contrary to" clearly established Supreme Court precedent when

"the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or . . . the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor,* 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court decision rests on an "unreasonable application" of clearly established Supreme Court precedent when "the state court identifies the correct governing legal principle from [the] · Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* Applying this deferential standard of review, we conclude that the state court's adjudication of all of Fullwood's claims except one was neither contrary to, nor an unreasonable application of, clearly established federal law as decided by the Supreme Court. With respect to Fullwood's claim that one of the jurors was subject to outside influence and pressure, we remand· for the district court to conduct an evidentiary hearing on this narrow issue.

## II.

Fullwood contends that he was deprived of a fair trial at his resentencing, as guaranteed by the Due Process Clause of the Fourteenth Amendment, because the resentencing jury, which was not sequestered, was subject to improper contact with third parties and considered extraneous information that the parties did not introduce at trial and the court did not provide to them.. *See Smith v. Phillips,* 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) ("Due process means a jury capable and willing to decide the case solely on the evidence before it."). Fullwood argues that we must vacate his sentence or, at a minimum, afford him an evidentiary hearing on his claims of juror misconduct.

In support of this claim, Fullwood relies solely upon the post-trial affidavit of Laura Booth who served as a juror during Fullwood's resentencing. Defense counsel obtained the affidavit during the process of conducting post-trial juror interviews.[3] Juror Booth's affidavit contains allegations that fall into essentially two categories. One is that of undue influence or pressure upon a juror by a nonjuror. The other involves the consideration by the jury of information not presented by the parties or the court during trial, which can be divided further into case-specific factual information and general information about the legal process. We consider each in turn.

## A. Outside Influence By a Third Party

According to Juror Booth, Juror Joyce Austin was "strongly influenced by ... her husband [who] was strongly pro-death penalty" and told Booth and other jurors that her husband "was constantly telling [Austin] during the trial and during deliberations that she should convict [Fullwood] and sentence him to death." J.A. 159. Booth also offered her opinion, by affidavit testimony, that "[i]t was obvious ... that the pressure brought upon [Austin] by her husband caused her to vote exactly the way he wanted her to." J.A. 159. Fullwood argues that Juror Booth's affidavit establishes that this improper contact with a third person actually influenced the jury's deliberations by causing one juror to choose a death sentence, which would require us to vacate his death sentence. Alternatively, Fullwood contends that because he has presented evidence that a juror was "constantly" subjected to her spouse's opinion that she should vote for a death sentence, he is, at a minimum, entitled to an evidentiary hearing on this issue.[4] In rejecting Fullwood's

---

**3.** The two attorneys who represented Fullwood during the resentencing proceedings and interviewed the jurors afterwards also submitted affidavits. With respect to this issue, however, these affidavits added nothing new, merely repeating what was contained in the Booth affidavit.

**4.** The current emphasis of Fullwood's claim seems to be slightly different than it was in state court. Accordingly, we are compelled to consider whether Fullwood properly exhausted this claim. See 28 U.S.C.A. § 2254(b)(1)(A) (West Supp.2001) ("An application for a writ of habeas corpus ... shall not be granted unless ... the applicant has exhausted the remedies available in the courts of the State ...." (emphasis added)). In state court, Fullwood framed the issue primarily as one of juror misconduct based on the jurors' purportedly untruthful affirmations during voir dire that they would be able to follow the court's instructions and confine their deliberations to the evidence submitted at trial. In Fullwood's application in district court for relief under § 2254, he framed this issue in much the same way.

The exhaustion requirement is subject to waiver, but the state must do so "expressly" and "through counsel." 28 U.S.C.A. § 2254(b)(3). Here, the state conceded in district court that the exhaustion requirement had been met, but, as noted, Fullwood summarized this claim in district court in much the same way as he did in state court. Therefore, we must determine whether Fullwood's claim has changed in any substantive way from the claim he presented in state postconviction relief proceedings.

"[T]he exhaustion requirement is satisfied so long as a claim has been 'fairly presented' to the state courts." Baker v. Corcoran, 220 F.3d 276, 288 (4th Cir.2000), cert. denied, 531 U.S. 1193, 121 S.Ct. 1194, 149 L.Ed.2d 110 (2001) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971)). To do so, the petitioner must present to the state court "both the operative facts and the controlling legal principles." Matthews v. Evatt, 105 F.3d 907, 911 (4th Cir. 1997) (internal quotation marks omitted). Although Fullwood did not articulate his argument in state court in precisely the same fashion as he did in his briefs to this court, we are satisfied that the substance of his claim was fairly presented to the state courts. The state does not argue to the contrary.

claim, the state MAR court stated three conclusions:

1. Juror's Affidavits to impeach a [jury's] deliberation are not favored by the Court.

2. [A juror's knowledge] of a prior death penalty in a resentencing hearing does not in itself mean that Juror could not give fair consideration to a life sentence.

3. . . . The Court, from the Juror's Affidavit and assuming it to be true, cannot find sufficient external influences that have an effect on the outcome of the verdict in this case to warrant the granting of a new trial.

J.A. 164. Presuming that Fullwood had presented all of his evidence on the issue through the affidavits he submitted, the court concluded that an evidentiary hearing was unnecessary.

▆▆▆▆ The state court did not specifically identify the legal principles guiding its analysis or cite the precedents upon which it relied. We are unable to ascertain the state court's rationale from the relatively summary nature of its disposition of this claim. When the state court decision being reviewed by a federal habeas court fails to provide any rationale for its decision, we still apply the deferential standard of review mandated by Congress to determine whether the decision ultimately reached by the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C.A. § 2254(d)(1) (West Supp.2001). *See Bell v. Jarvis*, 236 F.3d 149, 158, 163 (4th Cir.2000) (en banc), *cert. denied*, — U.S. ——, 122 S.Ct. 74, 151 L.Ed.2d 39 (2001). In the absence of any reasoning from the state court, however, we must conduct an independent review of the record and the applicable law to make the "contrary to" or "unreason-

able application" determinations. *See id.* at 163. Because we have no clear indication of the court's reasoning here, we will independently review the record and the law to make our "contrary to" or "unreasonable application" determinations. *See Harris v. Stovall*, 212 F.3d 940, 943 n. 1 (6th Cir.2000) ("Where a state court decides a constitutional issue by form order or without extended discussion, a habeas court should then focus on the result of the state court's decision, applying the standard articulated" by the AEDPA), *cert. denied*, 532 U.S. 947, 121 S.Ct. 1415, 149 L.Ed.2d 356 (2001).

▆▆▆▆ The Sixth Amendment guarantees a criminal defendant the right to an impartial jury. "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process." *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) (internal quotation marks omitted). The Supreme Court has clearly stated that private communications between an outside party and a juror raise Sixth Amendment concerns. *See Parker v. Gladden*, 385 U.S. 363, 364, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966) (per curiam). "[P]rivate talk, tending to reach the jury by outside influence" is constitutionally suspect because it is not subject to "full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Id.* (internal quotation marks omitted). Extrajudicial remarks directed at influencing a juror's resolution of an issue under deliberation, even if the remarks are isolated, may contravene the constitutional guarantee to a fair trial. *See id.* at 363–65, 87 S.Ct. 468 (finding habeas petitioner was deprived of his right to an impartial jury where the bailiff commented to two jurors during trial that the

"wicked fellow [petitioner], he is guilty" and that "[i]f there is anything wrong [in finding petitioner guilty] the Supreme Court will correct it" (first and third alterations in original)); *Stockton v. Virginia,* 852 F.2d 740, 743–46 (4th Cir.1988) (granting habeas relief where jurors were subject to remarks of a local restaurant owner who suggested they "fry the son of a bitch"). And, if even a single juror's impartiality is overcome by an improper extraneous influence, the accused has been deprived of the right to an impartial jury. *See Parker,* 385 U.S. at 366, 87 S.Ct. 468 ("[P]etitioner was entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors.").

■ Because the potential for mischief is so great when a third party establishes private, extrajudicial contact with a juror, the Supreme Court adopted the rule that "any private communication [or] contact ... with a juror during a trial about the matter pending before the jury is ... presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties." *Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954). The government bears the burden of rebutting the presumption of prejudice by demonstrating that "such contact with the juror was harmless to the defendant." *Id.* Fullwood argues that he is entitled to a presumption of prejudice that the state has failed to rebut.

■ We have applied *Remmer* in the federal habeas context. *See Stockton,* 852 F.2d at 743.[5] Under *Stockton,* when a habeas petitioner bases a juror bias claim on improper communication between, or improper influence exerted by, a nonjuror upon a juror, as Fullwood does here, he "must first establish both that an unauthorized contact was made and that it was of such a character as to reasonably draw into question the integrity of the verdict.... [T]he government [then] bears the burden of demonstrating the absence of prejudice." *Stockton,* 852 F.2d at 743; *see also Burch v. Corcoran,* 273 F.3d 577, 591 (4th Cir.2001) ("It is clear that the right to an impartial jury belongs to the defendant, and that a rebuttable presumption attaches to an impermissible communication." (alteration and internal quotation marks omitted)), *petition for cert. filed,* March 27, 2002 (No. 01–9358); *Howard v. Moore,* 131 F.3d 399, 422 (4th Cir.1997) (en banc).

■ However, "due process does not require a new trial every time a juror has been placed in a potentially compromising situation," since "it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." *Smith,* 455 U.S. at 217, 102 S.Ct. 940. Although intrusions into the jury's deliberative process create the potential for depriving a defendant of the constitutional guarantee of an impartial jury, the Supreme Court has generally found harmless error review appropriate. *See United States v. Olano,* 507 U.S. 725, 738, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) ("We generally have analyzed outside intrusions upon the jury for prejudicial impact."); *Parker,* 385 U.S. at 363–65, 87 S.Ct. 468 (concluding that bailiff's comment to two jurors that the "wicked fellow [petitioner], he is guilty" and that "[i]f there is any-

---

5. *Remmer* was a direct review case arising from a federal conviction, causing some jurists to question the applicability of *Remmer*'s presumptive prejudice rule in federal habeas proceedings. *See Crease v. McKune,* 189 F.3d 1188, 1193 (10th Cir.1999) ("We disagree that *Remmer* established the rule that any ex parte communication with a juror presumptively deprives a criminal defendant of due process under the Fourteenth Amendment.").

thing wrong [in finding petitioner guilty] the Supreme Court will correct it" was not harmless) (first and third alterations in original); *Remmer,* 347 U.S. at 230, 74 S.Ct. 450 (returning case for harmless error determination where unidentified person proposed a bribe to a juror, triggering an inquiry, of which defendant was unaware, by the Federal Bureau of Investigation); *Turner v. Louisiana,* 379 U.S. 466, 473–74, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965) (concluding that defendant suffered prejudice from officers' association with jurors in their charge during a case for which the officers were key prosecution witnesses and their testimony conflicted with that of the accused); *Smith,* 455 U.S. at 215, 102 S.Ct. 940 (observing, in an implied juror bias case, that "the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias"); *see also Sherman v. Smith,* 89 F.3d 1134, 1139 (4th Cir.1996) (en banc) ("Following the Supreme Court's lead, this court has repeatedly examined instances of juror misconduct and bias for harmlessness.").

■■■ Thus, even if the state court's determination that there is no constitutional error was "contrary to" or "an unreasonable application of" Supreme Court precedent, we are not permitted to grant habeas relief unless we are convinced that the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (internal quotation marks omitted). If we are in "grave doubt" as to the harmlessness of an error, the habeas petitioner must prevail. *See O'Neal v. McAninch,* 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). "Grave doubt" exists when, in light of the entire record, the matter is so evenly balanced that the court feels itself in "virtual

equipose" regarding the error's harmlessness. *Id.* at 435, 115 S.Ct. 992. We have applied the harmless error standard enunciated in *Brecht* to claims of juror bias or misconduct on several occasions. *See Bacon v. Lee,* 225 F.3d 470, 485 (4th Cir.2000) (applying *Brecht* to claim that jurors improperly considered race during deliberations in a North Carolina capital trial), *cert. denied,* 532 U.S. 950, 121 S.Ct. 1420, 149 L.Ed.2d 360 (2001); *Fitzgerald v. Greene,* 150 F.3d 357, 365 (4th Cir.1998) (concluding that even if one juror's bias resulted in a constitutional deprivation, "the principles of comity, federalism, and finality prevent us from overturning [petitioner's] convictions and sentence, unless we are convinced that the error had substantial and injurious effect or influence in determining the verdict" as required by *Brecht* (internal quotation marks and alteration omitted)); *Howard v. Moore,* 131 F.3d 399, 422 (4th Cir.1997) (en banc) (concluding that alleged ex parte communications with the jury had no "substantial and injurious effect or influence in determining the jury's verdict" (internal quotation marks omitted)); *Sherman v. Smith,* 89 F.3d 1134, 1140–41 (4th Cir.1996) (en banc) (applying *Brecht* to juror's unauthorized crime site visit).

### 1. Actual Influence

■■■ Fullwood contends that the Booth affidavit entitles him to habeas relief because it demonstrates that the verdict was actually influenced by improper external influence. With respect to Juror Austin, the Booth affidavit states that "[i]t was obvious to me that the pressure brought upon her by her husband caused her to vote exactly the way he wanted her to." J.A. 159. We conclude that Fullwood cannot use this portion of the Booth affidavit to impeach the jury's verdict. In order to protect the finality and integrity of verdicts and to guard against the harassment

of jurors, a party seeking to invalidate a verdict may not rely upon evidence of "a juror's mental process in connection with the verdict." *United States v. Cheek*, 94 F.3d 136, 143 (4th Cir.1996); *see* Fed. R.Evid. 606(b); *Tanner v. United States*, 483 U.S. 107, 121, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987). The Federal Rules of Evidence impose strict limits on the type of juror testimony that may be used to invalidate a verdict. *See* Fed.R.Evid. 606(b); *Bacon*, 225 F.3d at 485 (applying Fed.R.Evid. 606(b) to capital habeas proceedings); *Stockton*, 852 F.2d at 743–44 (same); *see also Gosier v. Welborn*, 175 F.3d 504, 510–11 (7th Cir.1999) (same). Rule 606(b) "is grounded in the common-law rule against admission of jury testimony to impeach a verdict." *Tanner*, 483 U.S. at 121, 107 S.Ct. 2739. It prohibits a juror from testifying as to "the effect of anything upon that or any other juror's mind or emotions as influencing the juror ... or concerning the juror's mental processes in connection therewith." Fed. R.Evid. 606(b). A juror may testify, however, as to "whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror." *Id.* Thus, "juror testimony concerning the *effect* of the outside communication on the minds of the jurors is inadmissible." *Stockton*, 852 F.2d at 744 (emphasis added).

North Carolina law imposes the same strict limits on the type of juror testimony that may be offered to impeach a verdict. *See* N.C. Gen.Stat. § 15A–1240 ("[N]o evidence may be received to show the effect of any statement, conduct, event, or condition upon the mind of a juror or concerning the mental processes by which the verdict was determined."). Under North Carolina law, jurors may testify as to the fact that external prejudicial communications were made, but not as to "the *subjective effect* those matters had on their verdict." *North Carolina v. Lyles*, 94 N.C.App. 240, 380 S.E.2d 390, 394 (N.C.Ct. App.1989).[6]

Since these principles preclude Juror Austin from testifying herself as to the effect of her husband's alleged comments on her internal thought processes in connection with her vote, they apply all the more to the hearsay testimony of Juror Booth, who was not only testifying about Austin's internal thought processes but was also speculating about how Austin arrived at her decision. We must therefore reject Fullwood's contention that he presented unopposed evidence that an improper external influence actually resulted in a death sentence and is therefore entitled to habeas relief.

### 2. Evidentiary Hearing

We turn to the question of whether Fullwood is entitled to an evidentiary hearing based on the assertion in the

---

**6.** Of course, the resolution of this issue does not turn upon our reading of *Lyles*, which we cite simply for the general proposition that North Carolina law tracks the basic outline of Federal Rule of Evidence 606(b). Even a proper application of a state rule limiting a juror's ability to impeach his own verdict can give rise to a Sixth Amendment claim of improper jury conduct. *See Doan v. Brigano*, 237 F.3d 722, 733–34 (6th Cir.2001) (holding that the application of Ohio Rule 606(b) by the state court to bar evidence of an out-of-court experiment by a juror failed to sufficiently preserve petitioner's Sixth Amendment rights). In any event, the state court did not reject Fullwood's claim for relief on state evidentiary grounds. Rather, the question is whether the district court should hold a hearing on Fullwood's claim for relief. We believe our decision in *Stockton* makes clear that Fullwood may present the portion of the Booth Affidavit previously specified to support his claim for relief.

Booth Affidavit that Austin's husband strongly believed in the death penalty as a general proposition and told Austin throughout the trial that she should vote for a death sentence in Fullwood's case.

■■■■ A district court may not grant an evidentiary hearing to a habeas petitioner if the petitioner "failed to develop the factual basis of a claim" in state court unless certain statutory requirements are satisfied. *See* 28 U.S.C.A. § 2254(e)(2). The state does not suggest that Fullwood "failed to develop" the factual basis of his claim as that phrase is used in section 2254(e)(2). *See Williams (Michael) v. Taylor,* 529 U.S. 420, 431–37, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000). Thus, section 2254(e)(2) presents no bar to an evidentiary hearing. *See id.* at 430, 120 S.Ct. 1479 (explaining that section 2254(e)(2) "applies only to prisoners who have failed to develop the factual basis" in state court). But, even though section 2254(e)(2) presents no bar to a hearing, an evidentiary hearing is not automatic—the district court is permitted to hold a hearing only if "the petitioner alleges additional facts that, if true, would entitle him to relief." *McCarver v. Lee,* 221 F.3d 583, 598 (4th Cir.2000). "[E]ven if [the petitioner's] claim is not precluded by § 2254(e)(2), that does not mean he *is* entitled to an evidentiary hearing—only that he *may* be." *McDonald v. Johnson,* 139 F.3d 1056, 1059–60 (5th Cir.1998). Moreover, petitioner must establish one of the six factors set forth in *Townsend v. Sain,* 372 U.S. 293, 312, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).[7] *See Fisher v. Lee,*

215 F.3d 438, 454 (4th Cir.2000), *cert. denied,* 531 U.S. 1095, 121 S.Ct. 822, 148 L.Ed.2d 706 (2001).

First, we conclude that because Fullwood has raised troubling allegations of improper external influence on the jury but was not afforded a hearing to develop the issue, he has satisfied at least one of the *Townsend* factors. *See Townsend,* 372 U.S. at 313, 83 S.Ct. 745 (requiring a hearing when the material facts are not adequately developed in state court).

■■■■ Second, we conclude that Fullwood has alleged facts that, if true, might well entitle him to relief. Of course, the mere fact that a juror's spouse may have a particularly strong philosophical or ideological leaning does not alone present the potential to undermine the integrity of the deliberative process. Such would not give rise to a presumption of prejudice since "the beliefs, biases, and preferences of every juror may be explored and exposed by the defendant at voir dire." *See Stockton,* 852 F.2d at 744 (distinguishing between "juror impairment or predisposition" and the more serious danger of an "extraneous communication").

The allegations here, however, concern more than predisposition. The allegations contained in the Booth affidavit suggest that Juror Austin may have been pressured throughout the trial to impose a death sentence, depriving Fullwood of his right to twelve impartial jurors. Indeed, if true, the allegations concerning Juror Austin are of a type that "draw into question the integrity of the verdict," *Stockton,* 852

---

7. The six *Townsend* factors are:
 (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.
 372 U.S. at 313, 83 S.Ct. 745.

F.2d at 743, and give rise to a presumption of prejudice. Given the paucity of the record and the lack of any factual findings, however, we are unable to determine whether an outside influence upon Juror Austin had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* 507 U.S. at 637, 113 S.Ct. 1710 (internal quotation marks omitted). Accordingly, we remand for an evidentiary hearing on the issue of whether the contact between Juror Austin and her husband throughout the trial deprived Fullwood of a fair trial and had a "substantial and injurious effect" on the verdict.

### B. *Consideration of Extraneous Facts Related to Fullwood's Case*

 We also conclude that during Fullwood's evidentiary hearing the district court should explore Fullwood's allegations that the jury considered, in violation of the Sixth Amendment, prejudicial information about his case that was never introduced into evidence or provided to the jury during trial. According to the Booth affidavit, "[t]he jury became aware from outside sources that Mr. Fullwood had already been sentenced to death by another jury. The jury became aware that Mr. Fullwood's original death sentence had been reversed because of some technicality involving a mistake the trial judge had made." J.A. 159. This allegation implicates Fullwood's Sixth Amendment rights because among the protections that the Sixth Amendment provides is the right to an impartial jury that arrives at a verdict "based upon the evidence developed at trial." *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *see Turner v. Louisiana,* 379 U.S. 466, 472–73, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965) ("[T]he evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." (internal quotation marks omitted)).

As we noted previously, a petitioner who seeks to invalidate a verdict that has already withstood challenges on direct review and state collateral review must introduce competent evidence that there was juror misconduct in the first place. *See Howard,* 131 F.3d at 422. Thus, Fullwood's allegations relating to the jury's alleged awareness of his prior death sentence must demonstrate that "extraneous prejudicial information" was improperly presented to the jury's attention. *United States v. Acker,* 52 F.3d 509, 516 (4th Cir.1995). If the information was both extraneous and prejudicial, Fullwood still may obtain relief only if it "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* 507 U.S. at 637, 113 S.Ct. 1710.

Fullwood has made a sufficient threshold showing that these facts were extraneous, prejudicial and improperly brought to the jury's attention so as to warrant an evidentiary hearing. Although Fullwood does not specifically identify the source of these facts, this information is "extraneous" because, so far as we can tell, it was not revealed to the jury during trial, and it is not the kind of general information that jurors bring with them into deliberations. *See United States v. Swinton,* 75 F.3d 374, 381 (8th Cir.1996) (observing that "[a]lthough jurors are expected to bring commonly known facts to bear in assessing the facts presented for their consideration, resort by a juror to anything other than common knowledge or record facts might be held to violate" the Sixth Amendment). And, generally speaking, such information is prejudicial in nature. *Cf. Arthur v. Bordenkircher,* 715 F.2d 118, 119 (4th Cir. 1983) ("[W]e are hard pressed to think of anything more damning to an accused than

information that a jury had previously convicted him for the crime charged." (internal quotation marks omitted)).

■ Because no evidentiary hearing has ever been held on this issue, there are also insufficient additional facts for us to determine whether the jury's awareness of Fullwood's previous sentence, if true, "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* 507 U.S. at 637, 113 S.Ct. 1710.[8] Accordingly, the district court, in conducting the evidentiary hearing, should also develop the issue of whether the jury's alleged awareness of Fullwood's prior death sentence deprived him of a fair trial and had a "substantial and injurious effect" on the verdict.[9]

### C. *Consideration of General Outside Information*

■ Finally, Fullwood supports his Sixth Amendment claim with two additional allegations contained in Juror Booth's affidavit. The first is that the jurors allegedly "became aware that any decision we made would be appealed," and that "this information was revealed to us by one of the other jurors who had learned this from an outside source." J.A. 159. The second is that the jurors discussed whether Fullwood would be eligible for parole if the jury recommended a life sentence:

> During deliberations, the jury became aware from outside sources that life imprisonment did not mean life.... [O]ne of the jurors had a family member that either worked at the courthouse or was involved in the law in some way. According to the juror's spouse or family member, a life sentence meant that the person would be paroled in 20–25 years. We discussed how Mr. Fullwood had already been in jail since the murder and that given credit for the time he had been in that he would be released on a life sentence in another 10–15 years.

J.A. 159–60.[10] With respect to these particular allegations, Fullwood has not made a sufficient showing that would entitle him to an evidentiary hearing. First, the Booth Affidavit fails to establish that the jurors' alleged awareness that Fullwood would appeal any decision it handed down was improperly communicated to the jury or that it was extraneous information at all. Not only is the availability of a crimi-

---

8. As previously stated, Fullwood can impeach the verdict with juror testimony as to the fact that extraneous information was given to the jury but not as to the subjective effect of the information on the jury's deliberative process. *See Stockton,* 852 F.2d at 744. Accordingly, Juror Booth's statement that the knowledge that Fullwood had received a death sentence the first time "lessen[ed] our sense of responsibility ... because we felt that twelve other rational people had sentenced Mr. Fullwood to death," J.A. 159, would not be admissible to show a substantial and injurious effect upon the verdict.

9. Our colleague correctly points out that Fullwood agreed to the seating of Juror Bell who indicated during voir dire that he had prior knowledge of the case. However, he, like all of the jurors, was instructed by the trial judge prior to voir dire that "[the jurors were] to take the evidence from this courtroom and no other source." J.A. 38. If in fact Bell was the juror who disclosed the fact of the prior death sentence, then the effect of the judge's instruction will complicate the issues presented to us. We therefore believe the better course is to direct that an evidentiary hearing be held to identify exactly what happened.

10. Juror Booth's additional statements as to the subjective effect of this information would not be admissible to impeach the verdict: that the knowledge that Fullwood would appeal "lessened our sense of responsibility ... because we felt that our decision was in no way final" and that the possibility that Fullwood might be eligible for parole "was a significant factor in our not sentencing him to life in prison" and resulted in the jury "not giv[ing] much consideration to the mitigating evidence." J.A. 159–60.

nal appeal commonly known information, but at least one of Fullwood's jurors had a fairly extensive legal background. Juror Booth revealed during voir dire that she earned an undergraduate degree in criminal justice, that she interned at the Public Defender's office in Spartanburg, South Carolina, and that she was employed for a period of time by a criminal defense attorney as a paralegal. Clearly, Juror Booth's experience made it likely that she would be familiar with the basics of the legal process, including criminal appeals. Fullwood accepted her as a juror despite the clear possibility that she would be a source of information about the legal process—as well as a favorable juror for him in light of her defense background.

■ Our conclusion is the same with respect to the allegations relating to the jury's alleged discussion of whether Fullwood might be eligible for parole. Fullwood failed to establish that the jury learned information about Fullwood's possible parole *from an outside source during trial.* Rather, the Booth affidavit, if true, establishes only that the jury discussed parole based on general sentencing information provided to an individual juror by the juror's family member who had some exposure to the law. The affidavit does not specify whether the information was passed along during trial or whether the juror learned the information during past discussion with his spouse. Moreover, in our view, this information does not qualify as an extraneous matter since virtually every juror will have preconceived notions about the legal process which the defendant can uncover and examine during jury selection. *See Stockton,* 852 F.2d at 744 ("[T]he beliefs, biases, and preferences of every juror may be explored and exposed by the defendant at voir dire."). We agree with the Seventh Circuit that, in the absence of any additional specific allegations of impropriety, when "an individual juror [takes] it upon himself to inform other members of the jury about his understanding ... that [a capital murder defendant] would serve [less than life] if [the jury] sentenced him to life," such information relates to the jury's internal discussions and may not be used to upend a verdict. *Silagy v. Peters,* 905 F.2d 986, 1008 (7th Cir.1990).

Accordingly, we conclude that Fullwood is not entitled to relief under either the "contrary to" or "unreasonable application" prong of § 2254(d) on his Sixth Amendment claim that the jury improperly considered his parole eligibility and the possibility that he might appeal.

## III.

Fullwood next contends that the State violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose to Fullwood and his attorney Fullwood's own statement to police officers shortly after the stabbing. At his initial trial, Fullwood moved, pursuant to *Brady,* for the State to disclose exculpatory evidence, including "[a]ny statements made by Michael Lee Fullwood to any law enforcement officer or any other witness which could be considered wholly or partially exculpatory, which could tend to negate any of the elements of first degree murder, or which could be considered in any way mitigating." J.A. 139. The State produced Fullwood's statement to Detective Walt Robertson and Sergeant Ted Lambert, who interviewed Fullwood on April 1, 1985, while he was in the hospital recovering from a stab wound and various cuts that the attending physicians determined to be self-inflicted. Fullwood admitted that he had killed Deidre, claiming that he did not intend to kill her but had gotten carried away as he fought with her at the Hawks' residence.

During Fullwood's resentencing, he moved to suppress this statement.[11] During the suppression hearing, Detective Robertson and Sergeant Lambert testified about Fullwood's statement on April 1, 1985. Prosecutors informed defense counsel they had learned, apparently for the first time, that during the interview Fullwood asked to speak alone with Detective Robertson, whom Fullwood had known for a number of years. Robertson testified that Fullwood began crying and said that he had indeed killed Deidre but that he had been using cocaine and had lost control. Fullwood also told Robertson that he had stabbed himself in the stomach and that he wanted to die. Fullwood did not testify at the suppression hearing. The state resentencing court denied Fullwood's motion to suppress his statement.

Fullwood contends that his defense "would have been greatly boosted by Officer Robertson's observations that Michael Fullwood was remorseful, distraught, and crying, and by Fullwood's statement to Robertson that he was under the influence of drugs at the time of the commission of the crime." Brief of Appellant at 36. Fullwood argues the disclosure of this statement would have affected his defense in two ways. First, Fullwood argues that this statement would have afforded him a diminished capacity defense aimed at mitigating his crime from first to second degree murder. See State v. Page, 346 N.C. 689, 488 S.E.2d 225, 231 (N.C.1997) (explaining that a diminished capacity defense may be presented to "negate[] [the defendant's] ability to form the specific intent to kill required for a first-degree murder conviction on the basis of premeditation and deliberation," but it "is not a defense to the element of malice in second-degree murder"). Second, Fullwood argues that his defense counsel, had he known about the statement, would have recommended that Fullwood testify about his drug use before he killed Deidre, which could have been corroborated to some extent by Detective Robertson.

The state court rejected this argument during post-conviction relief proceedings on three alternative bases: (1) the statement was not exculpatory; (2) Fullwood suffered no prejudice from the nondisclosure because Fullwood's attorney knew about the cocaine use from Fullwood's own statement; and (3) Fullwood suffered no prejudice because he himself knew that he had told Detective Robertson about his cocaine use, even if he failed to convey this fact to defense counsel.

■■■■ Brady teaches us that the prosecution deprives a criminal defendant of due process when it suppresses evidence that is "favorable to an accused ... where the evidence is material either to guilt or to punish, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87, 83 S.Ct. 1194. It is the petitioner's burden, see United States v. Stokes, 261 F.3d 496, 502 (4th Cir.2001), to establish the three elements of a Brady violation: (1) "[t]he evidence at issue must be favorable to the accused"; (2) the "evidence must have been suppressed by the State, either willfully or inadvertently"; and (3) the evidence must be material, i.e., "prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); see Spicer v. Roxbury Corr. Inst., 194 F.3d 547, 555 (4th Cir.1999).[12] We conclude that the decision

---

11. Fullwood also moved to suppress the statement at the first trial; however, the trial court did not rule on the motion because the State decided not to introduce the statement.

12. The fact that Detective Robertson had not passed along the substance of his private conversation to the prosecutor did not absolve the State of its duties under Brady because

of the state court was neither unreasonable nor contrary to law. Even assuming the evidence at issue qualified as favorable to Fullwood, he failed to establish the other two components of a *Brady* claim.

 First, the State did not suppress the information that came out during Fullwood's conversation with Detective Robertson because Fullwood, better than anyone, knew about his cocaine use on the night prior to the stabbing and knew that he had recounted this fact to Detective Robertson. The *Brady* rule "does not compel the disclosure of evidence available to the defendant from other sources, including diligent investigation by the defense." *Stockton v. Murray,* 41 F.3d 920, 927 (4th Cir.1994); *see also United States v. Wilson,* 901 F.2d 378, 381 (4th Cir.1990) ("[W]here the exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the *Brady* doctrine."). Thus, "[n]ondisclosure ... does not denote that no exculpatory evidence exists, but that the government possesses no exculpatory evidence that would be unavailable to a reasonably diligent defendant." *Barnes v. Thompson,* 58 F.3d 971, 975 n. 4 (4th Cir.1995). Certainly, then, information that is not merely available to the defendant but is actually known by the defendant would fall outside of the *Brady* rule. *See West v. Johnson,* 92 F.3d 1385, 1399 (5th Cir.1996) (rejecting capital defendant's *Brady* claim that the prosecution suppressed evidence suggesting that the defendant fabricated his confession of stealing a necklace from the victim; the defendant "knew whether or not he had

the *Brady* rule extends to evidence that is "known only to police investigators and not the prosecutor." *Kyles v. Whitley,* 514 U.S. 419, 438, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

taken the necklace, and necessarily knew that better than the prosecution could have"); *United States v. Diaz,* 922 F.2d 998, 1007 (2d Cir.1990) ("[T]here is no improper suppression within the meaning of *Brady* where the facts are already known by the defendant."). Fullwood testified at his resentencing trial that he used cocaine on the night before he killed Deidre. Moreover, in rejecting Fullwood's *Brady* claim in the MAR proceedings, the North Carolina state court concluded that Fullwood's attorney knew that Fullwood had been using cocaine on the night of the murder. Indeed, the record bears out the fact that trial counsel knew about Fullwood's cocaine use.[13] Fullwood has failed to come forward with clear and convincing evidence to rebut this finding. *See* 28 U.S.C.A. § 2254(e)(1); *Evans v. Smith,* 220 F.3d 306, 312 (4th Cir.2000), *cert. denied,* 532 U.S. 925, 121 S.Ct. 1367, 149 L.Ed.2d 294 (2001). Obviously, Fullwood and his attorneys knew about his cocaine use and could have pursued a diminished capacity defense. Likewise, Fullwood himself was well aware that he spoke in private with Detective Robertson and revealed that he had used cocaine on the night prior to Deidre's murder. The purported *Brady* material, therefore, was known to Fullwood and available for his use. Thus, the state court's determination that the statement was not required to be disclosed in the first place was neither contrary to law nor based on the unreasonable application of precedent.

 Second, Fullwood did not demonstrate that the State's failure to disclose Fullwood's mention of cocaine use to De-

13. When the trial court asked defense counsel whether he was aware of the substance of the conversation between Fullwood and Detective Robertson, counsel responded, "In general, yes, sir." Tr. Vol. VIII at 1353.

tective Robertson was material, *i.e.,* that the alleged nondisclosure caused him to suffer prejudice. The Supreme Court has explained that "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs,* 427 U.S. 97, 109–10, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Rather, materiality under *Brady* means that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). A reasonable probability exists when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley,* 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Again, we note that the failure to turn over this information in no way deprived Fullwood of a diminished capacity defense based on his cocaine use since Fullwood and his attorney were obviously aware of the cocaine use. The remaining argument is that, had Fullwood's trial counsel known about Fullwood's conversation with Detective Robertson, he would have advised Fullwood to take the stand and testify about his drug use because Detective Robertson could corroborate Fullwood's story. Instead, Fullwood's attorney feared that if Fullwood's testimony provided the only evidence of drug use in connection with the murder, it "would appear to the jury to be contrived." J.A. 154. This is not the type of evidence that "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles,* 514 U.S. at 435, 115 S.Ct. 1555. Indeed, Robertson could not corroborate Fullwood's cocaine use the night before the murder; Robertson could only corroborate the fact that Fullwood claimed to have used cocaine the night before the murder. Ultimately, Fullwood's testimony would still be the only direct evidence of his cocaine use. Accordingly, we conclude the North Carolina state court's rejection of Fullwood's *Brady* claim affords him no relief under either the "contrary to" or "unreasonable application" components of § 2254(d).

### IV.

Fullwood argues that he is entitled to an evidentiary hearing on his Sixth Amendment claim that he received ineffective assistance of counsel because of his attorney's conflict of interest. Specifically, Fullwood contends that a hearing is necessary to determine whether Al Williams, one of the attorneys on his original trial team who subsequently became an assistant district attorney, participated in the prosecution of Fullwood during the resentencing proceedings. Williams, then an assistant public defender, represented Fullwood during the guilt phase of trial and the original sentencing proceedings, but later accepted a position with the district attorney's office. By the time Fullwood's case had been returned for resentencing, Williams was employed as a prosecutor in the same district attorney's office that was handling Fullwood's prosecution. Fullwood claims that Williams participated on behalf of the state during resentencing, thereby depriving him of his right to counsel under the Sixth Amendment. *See Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Fullwood draws the factual basis for this claim from the fact that Williams was present in his capacity as a prosecutor during a July 22, 1991 criminal trial docket meeting in Buncombe County Superior Court to schedule various criminal cases, including

Fullwood's resentencing, for trial. Fullwood submitted to the state MAR court an extremely brief excerpt from a transcript of the July 22 court session. It appears, based on this transcript, that the only discussion of Fullwood's case during the July 22 court session involved a brief exchange between defense counsel and the court about when to schedule the resentencing trial. Neither Williams nor District Attorney Moore, who was also present, commented on the scheduling of Fullwood's case. At the time, Fullwood did not object to the presence of Williams in the courtroom. Fullwood contends that Williams' presence at the docket meeting demonstrates that Williams participated in the prosecution of his former client on the same charges against which he had previously defended Fullwood.

In response, the state submitted an affidavit from District Attorney Moore. According to Moore's affidavit, Williams was "completely 'fenced-off' from anything relating to *FULLWOOD*." J.A. 161. And, pursuant to office policy, "[t]he Fullwood case [was] never . . . discussed in front of Al Williams even until this date. Mr. Williams [was] . . . asked to leave the room whenever [prosecutor] Dreher or [District Attorney Moore] were working on the case and he happened to inadvertently come in or if either of [them] received a phone call pertaining to Fullwood and [Williams] was present." J.A. 162. Moore further attested that Williams was in court on July 22 not in connection with Fullwood's case but "because Judge Lewis and all counsel were engaged in a process of scheduling a number of cases for trial." J.A. 161. According to Moore, Williams may have called the names of the cases on the calendar, including Fullwood's, "which would [have] result[ed] in a report from the Bailiff that the named defendant was in custody." J.A. 161. Fullwood does not dispute the accuracy of Moore's affidavit.

The North Carolina MAR court rejected the claim that Williams had a conflict of interest that deprived Fullwood of his constitutional rights, finding that "there [was] no evidence that there was any unethical conflict caused by the District Attorney's office prosecuting the re-sentencing proceeding after Al Williams had become an Assistant District Attorney" and that "[t]here [was] no evidence that Mr. Williams took part in the preparation or assisted in the trial of [the] re-sentencing hearing in any way." J.A. 165. These factual determinations by the state court are presumptively correct, and Fullwood can rebut them only by presenting clear and convincing evidence to the contrary. *See* 28 U.S.C.A. § 2254(e)(1). Both the state MAR court and the district court denied Fullwood's request for an evidentiary hearing.

## A. Evidentiary Hearing

Because Fullwood did not "fail[] to develop" the factual basis of this claim, section 2254(e)(2) presents no bar to an evidentiary hearing in district court. *See Williams*, 529 U.S. at 430, 120 S.Ct. 1479. However, Fullwood is not entitled to a hearing unless he "alleges additional facts that, if true, would entitle him to relief and establishes one of [the six *Townsend* factors]." *Fisher*, 215 F.3d at 454 (internal quotation marks omitted).

Fullwood claims that he is entitled to an evidentiary hearing because he has presented facts that, if true, entitle him to relief on this claim. Fullwood raises a Sixth Amendment claim based on what he perceives to be his attorney's conflict of interest as opposed to his attorney's deficient performance at trial or sentencing. Indeed, "[a] necessary corollary" to Fullwood's Sixth Amendment right to effective assistance of counsel "is the right to

representation that is free from conflicts of interest." *Burket v. Angelone*, 208 F.3d 172, 184 (4th Cir.2000) (internal quotation marks omitted); *see Cuyler v. Sullivan*, 446 U.S. 335, 345–50, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). When defense counsel's performance is impeded by an actual conflict of interest, counsel "breaches the duty of loyalty, perhaps the most basic of counsel's duties," and renders ineffective assistance. *Strickland*, 466 U.S. at 692, 104 S.Ct. 2052. Moreover, "the duty of loyalty is violated not merely when counsel represents clients who have conflicting interests, but also when counsel acts more for the benefit of, and with more apparent sympathy toward, the prosecution than the client he is defending." *Fisher v. Gibson*, 282 F.3d 1283, 1291 (10th Cir.2002); *see Osborn v. Shillinger*, 861 F.2d 612 (10th Cir.1988) ("[A]n attorney who adopts and acts on a belief that his client should be convicted 'fail[s] to function in any meaningful sense as the Government's adversary.'") (quoting *United States v. Cronic*, 466 U.S. 648, 666, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)). Accordingly, an attorney whose loyalties are so conflicted that he or she is no longer "functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" renders ineffective assistance. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052.

■■■■ When a habeas petitioner claims a Sixth Amendment deprivation because of his attorney's conflict of interest, then the two-part *Strickland* analysis for ineffective assistance claims is modified slightly. *See Burket*, 208 F.3d at 184. On a conflict-of-interest claim, petitioner must show (1) that his attorney had "an actual conflict of interest" and (2) that the conflict of interest "adversely affected his lawyer's performance." *Cuyler*, 446 U.S. at 348, 100 S.Ct. 1708. An actual conflict arises when counsel "*actively* represents conflict-

ing interests." *United States v. Tatum*, 943 F.2d 370, 375 (4th Cir.1991) (emphasis added). Once the petitioner establishes *both* an actual conflict of interest *and* an adverse effect on defense counsel's performance, then "prejudice to the defense is presumed and a new trial must be ordered." *Id.; see Cuyler*, 446 U.S. at 348–50, 100 S.Ct. 1708.

■■■■ Fullwood has failed to present clear and convincing evidence to rebut the state court's factual finding that "[t]here [was] no evidence that Mr. Williams took part in the preparation or assisted in the trial of [the] re-sentencing hearing in any way." J.A. 165. The only evidence Fullwood offered in support of this claim was the excerpt of the transcript from the July 22 court proceeding, suggesting that it raised the possibility of Williams' improper involvement in the ongoing prosecution of his former client Fullwood. The state countered with an affidavit explaining the July 22 proceeding. The state court's determination that Williams did not participate in the resentencing was reasonable, given the evidence presented to the state court and the speculative nature of Fullwood's allegations of Williams' participation in the resentencing proceedings. *See* 28 U.S.C.A. § 2254(d)(2). Fullwood has failed to present any other facts, much less clear and convincing evidence, that would rebut the state court's determination. *See* 28 U.S.C.A. § 2254(e)(1). Therefore, we must accept it as true. *See Howard*, 131 F.3d at 406.

Because we accept as true the determination that Williams did not assist in the prosecution of Fullwood during resentencing, Fullwood must "allege additional facts that, if true, would entitle him to relief." *McCarver*, 221 F.3d at 598 (internal quotation marks omitted). Fullwood has failed to allege additional facts that, if proven, would establish Williams had an actual

conflict of interest and that the conflict adversely affected his performance. The focus of Fullwood's ineffective assistance claim is on what Williams did *after* he no longer represented Fullwood, not *during* the time he served as Fullwood's attorney. Fullwood does *not* claim that Williams had a conflict of interest that hindered his performance during the guilt phase or the original sentencing phase. Nor does Fullwood contend that Williams' performance was subpar in any respect *during* the original trial.[14] Fullwood does not forecast any evidence suggesting that Williams actively represented any interest other than Fullwood's during the original trial or that Williams had a relationship with the district attorney's office that hindered his ability to represent Fullwood. *See Tatum,* 943 F.2d at 375 (explaining that an actual conflict of interest arises when counsel "actively represents conflicting interests"). Accordingly, we reject Fullwood's claim that he is entitled to an evidentiary hearing on this issue.[15]

### B. *District Court's Failure to Inquire*

We also reject Fullwood's claim that the failure of the state court to inquire *sua sponte* into a possible Sixth Amendment violation based on Williams' presence at the docket meeting requires us to remand for an evidentiary hearing. A state court does indeed have a duty to inquire into defense counsel's possible conflicts of interest if the court "knows or reasonably should know that a particular conflict exists." *Cuyler,* 446 U.S. at 347, 100 S.Ct. 1708. Fullwood claims that he is entitled to relief or to a hearing because there was no inquiry by the trial court into a possible conflict of interest. The Supreme Court, however, recently rejected the idea that a habeas petitioner is automatically entitled to relief when the trial court fails to make an inquiry mandated by *Cuyler. See Mickens v. Taylor,* 535 U.S. ——, ——, 122 S.Ct. 1237, 1244, 152 L.Ed.2d 291, —— (2002). Even if the trial court has failed to conduct a mandatory review under *Cuyler,* the petitioner still must be able to establish "that the conflict of interest adversely affected his counsel's performance." *Id.* at 1245.

Fullwood suggests that we should order a hearing on this issue because he has not been afforded one in state or federal court. *Mickens,* however, does not require that an evidentiary hearing be held in all circumstances, nor does *Mickens* alter the fact that a court's duty to inquire extends only to conflicts of which it is or reasonably should be aware. *See Cuyler,* 446 U.S. at 347, 100 S.Ct. 1708. There was

---

14. During state habeas proceedings, Fullwood claimed that Williams' performance during the original trial was deficient. Fullwood also advanced this claim in district court; however, he has chosen not to pursue that claim on appeal.

15. Although Fullwood advances this claim on Sixth Amendment grounds, we note that he is likewise entitled to no relief on this claim to the extent that he cited to, but did not develop an argument upon, the Fifth, Eighth and Fourteenth Amendments.

Because our focus in an ineffective assistance claim is on whether the petitioner's attorney, *during the time that he or she represented the petitioner,* was so divided in his or her loyalties that the petitioner was effectively without counsel, *see Cuyler,* 446 U.S. at 345–50, 100 S.Ct. 1708; *Holloway v. Arkansas,* 435 U.S. 475, 481–83, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); *Tatum,* 943 F.2d at 375, general due process principles seem less analytically awkward here. *See United States v. Schell,* 775 F.2d 559, 566 (4th Cir.1985) ("We conclude that due process is violated when an attorney represents a client and then participates in the prosecution of that client with respect to the same matter."). In any event, given Fullwood's inability to rebut the factual determinations of the state court, our conclusion would be the same even if Fullwood had vigorously pursued a due process theory.

never any objection by Fullwood's defense team to Williams' appearance at the docket meeting. Fullwood has not directed us to anything else that would indicate that the state court should have known of a potential Sixth Amendment problem. *See Mickens,* 122 S.Ct. at 1242 (explaining that there is no obligation to inquire "when the trial court is aware of a vague, unspecified possibility of conflict"). "Absent such an objection [to the attorney's participation], a petitioner must satisfy the two-part conflict-of-interest standard identified by [*Cuyler v. Sullivan*]." *Mickens v. Taylor,* 240 F.3d 348, 358 (4th Cir.2001) (en banc), *aff'd,* 535 U.S. ——, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002). For the reasons stated previously, Fullwood is not entitled to an evidentiary hearing on the two-part *Cuyler* test. Fullwood does not even allege that Williams actively served conflicting interests, much less that Williams' alleged divided loyalties deprived him of counsel. Because the state court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established law, Fullwood is not entitled to relief under § 2254(d).

## V.

Fullwood contends that the trial court's exclusion of purportedly mitigating evidence on state evidentiary grounds amounted to an error of constitutional magnitude. During resentencing, defense counsel sought to elicit testimony from Fullwood's mother about Fullwood's reaction to the death of his older brother, a murder victim. The trial court initially excluded this testimony on hearsay grounds. However, the court permitted Fullwood to make an offer of proof outside of the presence of the jury, whereupon this exchange took place:

Q. What was [defendant's] reaction to the death of his brother about five months prior to [the victim's] murder?

A. [Defendant] was very upset at the death of his brother. He was there at the nursing home when I received the call about the death of my son.

Q. What did he do—did you see him do or say something?

A. Well, he called [the victim] and [the victim] came on over. She came in from work. She was right there with me.... But [defendant] was very upset about the death of his brother.

Q. Did [defendant] continue to be upset about the death of his brother?

A. I don't think he ever really got over it completely. He was depressed and everything.

Q. Was [your son] who died [defendant's] older brother?

A. He was, and they were very close. He was my firstborn child.

Q. You indicated that [defendant] was depressed over the loss of his brother?

A. He was.

COURT: Now, [defense counsel], you haven't asked those questions previously.

[DEFENSE COUNSEL]: No, sir, but I asked what [defendant's] reaction was to his brother's death and you sustained that.

COURT: Yes, sir, I did.

[DEFENSE COUNSEL]: Would you allow me to ask these questions?

COURT: I rule upon them when they're asked....

*Fullwood III,* 472 S.E.2d at 888–89. After the jury returned, defense counsel did not attempt to ask Fullwood's mother these or any other questions about Fullwood's reaction to the murder of his brother.

On direct appeal, the North Carolina Supreme Court rejected Fullwood's argument that the trial court excluded "potentially compelling mitigating evidence in violation of the Eighth Amendment." *Id.* at 888. The court explained that state evidentiary law permitted "[l]ay opinion on the emotional state of another[,] . . . if rationally based on the perception of the witness." *Id.* at 889. However, "[a]t the time [Fullwood's] mother was [first] asked [about Fullwood's] reaction to his brother's death, no evidence had been presented that [Fullwood's] mother had [sufficient] personal knowledge of [his] mental state" to permit an answer to the question. *Id.* The court concluded that Fullwood could not demonstrate prejudice even if the trial court had committed error because Fullwood never pursued the matter again despite the fact that "testimony was presented during *voir dire* to establish that defendant's mother had personal knowledge sufficient to answer the question." *Id.*

 The deferential standard of review contained in § 2254(d) applies only to federal claims that are "adjudicated on the merits" by the state court, *i.e.*, "[i]f the claim was properly presented to the state court and the state court adjudicated it." *Fisher*, 215 F.3d at 445. However, if the "petitioner has properly presented a claim to the state court but the state court has not adjudicated the claim on the merits," we apply a de novo standard of review. *Weeks v. Angelone*, 176 F.3d 249, 258 (4th Cir.1999), *aff'd*, 528 U.S. 225, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000). Although the North Carolina Supreme Court specifically discussed only state evidentiary law in resolving this claim, we are satisfied that Fullwood's claim was adjudicated on the merits for purposes of § 2254. Recognizing that Fullwood's claim was premised on the Eighth Amendment, the state court's ultimate conclusion was that Fullwood could not show "prejudicial error." *Fullwood III*, 472 S.E.2d at 889. The state court, however, did not discuss its reasoning. The deferential standards of § 2254(d)(1) apply, but we must independently review the record and the applicable legal principles to apply them. *See Bell*, 236 F.3d at 163; *Quinn v. Haynes*, 234 F.3d 837, 844 n. 8 (4th Cir.2000) (state court adjudicated constitutional claim on the merits where claim was squarely presented to it even though court limited its analysis to state law), *cert. denied*, 532 U.S. 1024, 121 S.Ct. 1968, 149 L.Ed.2d 762 (2001).

 A state court's resolution of an evidentiary question generally does not give rise to a cognizable claim under § 2254. *See Hutchins v. Garrison*, 724 F.2d 1425, 1437 (4th Cir.1983) (" 'Normally, the admissibility of evidence . . . in state trials [is a matter] of state law and procedure not involving federal constitutional issues.' ") (alteration in original) (quoting *Grundler v. North Carolina*, 283 F.2d 798, 802 (4th Cir.1960)). However, in the case of evidence offered in mitigation at the sentencing phase of a capital trial, "the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (emphasis in original); *see Eddings v. Oklahoma*, 455 U.S. 104, 113–14, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) ("Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence."). Thus, "the Supreme Court has

been very sensitive to any impediment to the consideration of any *type* of mitigating evidence in a death sentencing hearing." *Hutchins,* 724 F.2d at 1437. We have noted that, under certain circumstances, "[t]he Due Process Clause of the Fourteenth Amendment *may* require the admission of mitigating evidence even if state-law rules of evidence (*e.g.,* hearsay) would exclude it." *Boyd v. French,* 147 F.3d 319, 326 (4th Cir.1998) (emphasis added) (citing *Green v. Georgia,* 442 U.S. 95, 97, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979) (per curiam)).

 On the other hand, the principles developed in *Lockett* and *Eddings* do not eviscerate all state evidentiary rules with respect to mitigating evidence offered in capital sentencing proceedings. *See Hutchins,* 724 F.2d at 1437 ("We find no indication that *Eddings* and *Lockett* preempt all state rules of evidence. Both cases speak about *types* of evidence, not evidentiary rules."). For example, the application of the hearsay rule to exclude evidence offered in mitigation of the death penalty is clearly not a *per se* constitutional violation. *See Buchanan v. Angelone,* 103 F.3d 344, 348–49 (4th Cir.1996), *aff'd,* 522 U.S. 269, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998). It is permissible to exclude on hearsay grounds mitigating evidence which is "only [of] cumulative probative value." *Id.* at 349 (concluding that "[t]he exclusion of the hearsay statements offered ... for the purpose of providing additional support for Dr. Brown's conclusion that Buchanan acted under extreme distress" was not reversible error because Buchanan was able to offer other evidence of the mitigating circumstance).

 Assuming the testimony from Fullwood's mother about Fullwood's reaction to his brother's murder would have supported one of the mitigating circumstances Fullwood offered to the jury or would have constituted a circumstance to which the jury independently would have accorded mitigating value, Fullwood has not demonstrated how the exclusion of this testimony could have had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* 507 U.S. at 637, 113 S.Ct. 1710 (internal quotation marks omitted). First, the trial judge did not bar Fullwood categorically from presenting evidence about his reaction to his brother's murder; rather, Fullwood's mother was precluded from testifying on evidentiary grounds. After Fullwood established a better foundation for this line of questioning, the trial court made clear that he was free to try again, but he did not further pursue this issue. Second, Fullwood himself obviously could have testified about this subject when he took the stand on his own behalf but he failed to do so. Fullwood had every opportunity to present this information to the jury after the initial hearsay objection was sustained. Accordingly, we conclude that the decision of the state court rejecting this claim was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.

## VI.

 Finally, Fullwood contends that the jury instructions were unconstitutionally vague under the Eighth Amendment. The jury unanimously found beyond a reasonable doubt the existence of the single aggravating circumstance that was presented to the jury—that the murder was especially heinous, atrocious or cruel. *See* N.C.G.S. § 15A 2000(e)(9). "In the case of statutory aggravating circumstances in a capital punishment scheme, a circumstance may be so vague as to provide no ... meaningful basis for distinguishing a death penalty case from other murders," *Fisher,* 215 F.3d at 457, thereby "fail[ing] ade-

quately to inform juries what they must find to impose the death penalty and ... leav[ing] them ... with the kind of open-ended discretion" that has been held to violate the Eighth Amendment, *Maynard v. Cartwright*, 486 U.S. 356, 361–62, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988).

■ Standing alone, North Carolina's "especially heinous, atrocious, or cruel" aggravating circumstance is unconstitutionally vague. *See Maynard*, 486 U.S. at 363–64, 108 S.Ct. 1853 (holding Oklahoma's "especially heinous, atrocious, or cruel" aggravating circumstance to be unconstitutionally vague); *Fisher*, 215 F.3d at 458 (recognizing constitutional infirmity of North Carolina's "especially heinous, atrocious, or cruel" aggravating circumstance).

■ If "[a] statutory circumstance ... is alone too vague to provide meaningful guidance to the sentencer [it] may be accompanied by a limiting instruction which does provide sufficient guidance." *Fisher*, 215 F.3d at 457; *see Walton v. Arizona*, 497 U.S. 639, 654, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990) (explaining that if the statutory aggravating circumstance is too vague, then the court must "determine whether the state courts have further defined the vague terms and ... whether those definitions are constitutionally sufficient"); *Smith v. Dixon*, 14 F.3d 956, 974 (4th Cir.1994) (en banc) (explaining that North Carolina's scheme needs a limiting instruction to pass constitutional muster).

At resentencing, the trial court instructed the jury that

one possible aggravating [circumstance] may be considered by you and that one only. The following is the aggravating circumstance which might be applicable in this case. Was this murder especially heinous, atrocious or cruel? In this context, "heinous" means extremely wicked or shockingly evil. "Atrocious" means

outrageously wicked and vile. And "cruel" means designed to inflict a high degree or pain with utter indifference or even enjoyment of the suffering of others. However, it is not enough that this murder be heinous, atrocious or cruel as those terms have just been defined. This murder must have been especially heinous, atrocious or cruel, and not every murder is especially so. For this murder to have been especially heinous, atrocious or cruel, any brutality which was involved in it must have exceeded that which is normally present in any killing or this murder must have been a [conscienceless] or pitiless crime which was unnecessarily tortuous to the victim.

Tr. August 18, 1994 at 8–9.

Fullwood argues that this instruction fails to provide constitutionally sufficient guidance to the jury. The North Carolina Supreme Court rejected this argument on direct appeal following Fullwood's resentencing trial, *see Fullwood III*, 472 S.E.2d at 893, thus refusing to depart from its previous decision that an identical set of jury instructions was constitutionally sufficient under United States Supreme Court precedent, *see North Carolina v. Syriani*, 333 N.C. 350, 428 S.E.2d 118, 140–41 (N.C. 1993).

We conclude that the North Carolina Supreme Court's rejection of Fullwood's claim was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent. We recently rejected this argument in two capital cases involving the same North Carolina statutory aggravating circumstance. *See Fisher*, 215 F.3d at 457–59; *see also Frye v. Lee*, 235 F.3d 897, 907–08 (4th Cir.), *cert. denied*, 533 U.S. 960, 121 S.Ct. 2614, 150 L.Ed.2d 769 (2001). We do so again in Fullwood's case.

## VII.

To sum up, we grant Fullwood's application for a certificate of appealability on his claim of improper jury contact, but we reverse the decision of the district court only on the narrow grounds that Fullwood should have been afforded a hearing on his claim that Juror Austin was improperly influenced during the trial by her husband, and that the jury improperly learned of and considered the fact that Fullwood had been sentenced to death for Deidre's murder once before. We affirm the remainder of the district court's disposition of that claim. With respect to the other claims, we conclude that the state court's refusal to grant relief was neither contrary to, nor an unreasonable application of, clearly established federal law as decided by the Supreme Court. We deny Fullwood's application for a certificate of appealability with respect to his other claims and dismiss them accordingly.

*AFFIRMED IN PART, REVERSED IN PART, DISMISSED IN PART AND REMANDED.*

WIDENER, Circuit Judge, concurring and dissenting:

I concur in the majority opinion with the exception of Part II thereof, as to which I respectfully dissent. I would affirm.

Part II of the majority opinion is divided into two parts: Part A. is *Outside Influence By a Third Party.* Part B. is *Consideration of Extraneous Facts Related to Fullwood's Case.*

I first consider Part A., which relies upon Miss Booth's affidavit,[1] which the majority describes as "Juror Joyce Austin was 'strongly influenced by _____, her husband [who] was strongly pro-death penalty' and told Booth and other jurors that her husband 'was constantly telling

[Austin] during the trial and during deliberations that she should convict [Fullwood] and sentence him to death.'" The affidavit also included Booth's opinion that "it was obvious ... that the pressure brought upon [Austin] by her husband caused her to vote exactly the way he wanted her to."

In North Carolina, when a verdict is sought to be impeached, as here, N.C. Gen.Stat. § 15A–1240 applies and is as follows:

§ 15A–1240. Impeachment of the verdict

(a) Upon an inquiry into the validity of a verdict, no evidence may be received to show the effect of any statement, conduct, event, or condition upon the mind of a juror or concerning the mental processes by which the verdict was determined.

(b) The limitations in subsection (a) do not bar evidence concerning whether the verdict was reached by lot.

(c) After the jury has dispersed, the testimony of a juror may be received to impeach the verdict of the jury on which he served, subject to the limitations in subsection (a), only when it concerns:

(1) Matters not in evidence which came to the attention of one or more jurors under circumstances which would violate the defendant's constitutional right to confront the witnesses against him; or

(2) Bribery, intimidation, or attempted bribery or intimidation of a juror.

The Booth affidavit, with respect to Mrs. Austin's husband, was plainly within § 1240(a) as "any statement, conduct, event, or condition upon the mind of a juror or concerning the mental processes by which the verdict was determined."

---

1. The Booth affidavit is appended hereto.

That being true, since, under the statute, "no evidence may be received" to show any such effect, there is not any requirement under the United States Constitution for an evidentiary hearing on that issue.

The majority decision relying on a decision of the North Carolina intermediate Court of Appeals, *North Carolina v. Lyles*, 94 N.C.App. 240, 380 S.E.2d 390, 394, has decided that the affidavit with respect to Mrs. Austin's husband is admissible to show the fact of an external prejudicial communication but not as to "the *subjective effect* those matters had on their verdict."

One problem with the majority decision is that *Lyles* did not decide the case under § (a) of the statute, as the majority decision infers, rather *Lyles* was decided under § (c)(1) of the statute, and its decision was obviously correct under the facts of that case. In *Lyles*, a photograph of a lineup had been admitted into evidence, with a paper under the bottom of the photograph concealing the words "Police Department, Wilson, North Carolina— 12291, 12–07–81." That evidence contradicted testimony of the defendant's alibi witnesses and thus it was evidence which was considered by the jury and was given to the jury after the jury retired, and not in the presence of the defendant, which violated the confrontation clause. Thus, the fact of the consideration of the date and place of the photograph by the jury was in violation of § (c)(1) of the statute. It is true that the court also considered the consideration of that substantive evidence extraneous information within the meaning of Rule 606(b), but we are not dealing here with any item of substantive evidence, only with outside influence by a third party. And Miss Booth attempts by her affidavit to impeach her own verdict, in violation of the rule. The majority does not consider *North Carolina v. Heatwole*, 344 N.C. 1,

473 S.E.2d 310 (N.C.1996); *North Carolina v. Rosier*, 322 N.C. 826, 370 S.E.2d 359 (N.C.1988); *North Carolina v. Mutakbbic*, 317 N.C. 264, 345 S.E.2d 154 (N.C. 1986); *North Carolina v. Johnson*, 298 N.C. 355, 259 S.E.2d 752 (N.C.1979), and *North Carolina v. Cherry*, 298 N.C. 86, 257 S.E.2d 551 (N.C.1979), an unbroken string of cases from the North Carolina Supreme Court giving literal effect to § 15A–1240. Indeed, even the *Lyles* case states that "Both Rule 606(b) and § 15A–1240 unambiguously prohibit inquiry into the effect of *anything* occurring during deliberations upon jurors' minds." 380 S.E.2d at 394.

Because I believe that "outside influence" as related in the majority opinion may only refer to influence upon the mind of Mrs. Austin, I think that remanding the same for an evidentiary hearing is not required by the Constitution and that the decision of the North Carolina state courts to give no relief on account of the Booth affidavit in that respect is not contrary to, or an unreasonable application of, clearly established federal law as decided by the Supreme Court of the United States. See *Tanner v. United States*, 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987).

I next consider Part II B. of the majority opinion which is based on the Booth affidavit to the effect that "The jury became aware from outside sources that Mr. Fullwood had already been sentenced to death by another jury. The jury became aware that Mr. Fullwood's original death sentence had been reversed because of some technicality involving a mistake the trial judge had made."

I believe no hearing is constitutionally required since defendant's sixth amendment rights were not affected by the alleged extraneous contacts. Therefore, the state habeas court's finding was not "contrary to, or involved an unreasonable ap-

plication of, clearly established Federal law...." 28 U.S.C.A. § 2254(d)(1).

*Brecht* requires extraneous and prejudicial information to have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). But no such harm is present here. As noted in the district court opinion, "trial counsel knew as a result of voir dire that a member of the jury had some prior knowledge of the case, and had read newspaper accounts relating to Petitioner's prior sentencing, but affirmatively decided that such information would not affect the juror's ability to provide Petitioner with a fair re-sentencing hearing." Trial counsel did not excuse this juror and excuse-for cause was not required.[2] *State v. Green*, 336 N.C. 142, 443 S.E.2d 14 (1994), *cert denied*, 513 U.S. 1046, 115 S.Ct. 642, 130 L.Ed.2d 547. Under North Carolina law, reversal is not required by a juror's knowledge of a defendant's prior death sentence. *State v. Simpson*, 331 N.C. 267, 271, 415 S.E.2d 351 (1992), *cert. denied*, 516 U.S. 1161, 116 S.Ct. 1048, 134 L.Ed.2d 194 (1996). Defendant, however, does not challenge this juror's possible prejudice, but instead relies on the Booth affidavit.

This affidavit alleges that the jurors obtained outside information relating to defendant's case. In particular, the affidavit claims "the jury became aware that Mr. Fullwood's original death sentence had been reversed because of some technicality involving a mistake the trial judge had made." Along with the two defense attor-

neys' affidavits, this Booth affidavit was the only evidence filed with the state habeas court in support of defendant's constitutional claims. The majority's opinion explained Miss Booth's background:

> Juror Booth revealed during voir dire that she earned an undergraduate degree in criminal justice, that she interned at the Public Defender's office in Spartanburg, South Carolina, and that she was employed for a period of time by a criminal defense attorney as a paralegal. Clearly, Juror Booth's experience made it likely that she would be familiar with the basics of the legal process, including criminal appeals. Fullwood accepted her as a juror despite the clear possibility that she would be a source of information about the legal process—as well as a favorable juror for him in light of her defense background.

Even with Miss Booth's affidavit, defendant offers no evidence that any alleged juror knowledge concerning his past conviction did not, in fact, come from the juror who stated during voir dire that he had knowledge of this past conviction. Because defense counsel refused to remove the juror and North Carolina law permits this juror to sit on the jury, I do not believe that the state habeas court's decision is contrary to, or an unreasonable application of, federal law.[3]

Moreover, I agree with the state habeas court that defendant had presented his evidence with respect to said issue by the affidavit. Assuming the alleged extraneous information was not attained by the

---

**2.** In addition, as noted on direct appeal by the North Carolina Supreme Court, "defendant failed to exercise all of his peremptory challenges."

**3.** On habeas review of *State v. Green*, the federal district court affirmed the North Carolina Supreme Court's determination that the

trial judge's decision denying defendant's motion to excuse the juror for cause, who had information about the previous conviction. *Green v. French*, 978 F.Supp. 242, 264 (E.D.N.C.1997), *affirmed*, 143 F.3d 865 (4th Cir.1998) (the current question not discussed).

juror who had knowledge of defendant's past conviction, I believe that this affidavit's vagueness, in failing to mention any particular outside contact, precludes an evidentiary hearing since the defendant has not introduced "competent evidence that there was an extrajudicial communication or contact." [4] *Howard v. Moore*, 131 F.3d 399, 422 (4th Cir.1997) (en banc).

Thus, I am of opinion that the decision of the state court declining to give any relief on account of the Booth affidavit was not "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."

Finally, I fear that the precedent of impeaching this verdict on the strength of the Booth affidavit is establishing precedent which will denigrate jury verdicts.

STATE OF NORTH CAROLINA

COUNTY OF BUNCOMBE

### AFFIDAVIT OF LAURA BOOTH

LAURA BOOTH, being first duly sworn, does hereby depose and say:

1. In 1994, I was one of the jurors who served on the jury which presided over the re-sentencing of Michael Lee Fullwood. The jury recommended that Mr. Fullwood be sentenced to death;

2. During the trial the jury was instructed not to listen to news accounts of the case, not to conduct its own investigation, and not to discuss the case with friends and family members. Regardless of how hard we tried to comply, the media, friends and family were constantly available providing us with outside information.

3. At various times during the trial and during deliberations, jurors gained outside information from newspapers, news broadcasts, friends and family members about various aspects of Mr. Fullwood's case. This outside information was used by the jury during its deliberations as is more specifically set forth below;

4. The jury became aware from outside sources that Mr. Fullwood had already been sentenced to death by another jury. The jury became aware that Mr. Fullwood's original death sentence had been reversed because of some technicality involving a mistake the trial judge had made. This knowledge did lessen our sense of responsibility in making the decision because we felt that twelve other rational people had sentenced Mr. Fullwood to death;

5. We also became aware that any decision we made would be appealed. I believe this information was revealed to us by one of the other jurors who had learned this from an outside source. This knowledge lessened our sense of responsibility in making our decision because we felt that our decision was in no way final;

6. One juror in particular, Joyce Austin, was strongly influenced by an outside source. Ms. Austin told us that her husband was strongly pro-death penalty and that he was constantly telling her during the trial and during deliberations that she should convict him and sentence him to death. It was obvious to me that the pressure brought upon her by her husband caused her to vote exactly the way he wanted her to;

7. During deliberations, the jury became aware from outside sources that life imprisonment did not mean life. As I re-

---

4. I do not believe that this affidavit, particularly when provided by a juror with Miss Booth's background, sufficiently warrants a presumption of prejudice, which if not rebutted, requires an evidentiary hearing.

call, one of the jurors had a family member that either worked at the courthouse or was involved in the law in some way. According to the juror's spouse or family member, a life sentence meant that the person would be paroled in 20–25 years. We discussed how Mr. Fullwood had already been in jail since the murder and that given credit for the time he had been in that he would be released on a life sentence in another 10–15 years. That Mr. Fullwood would be paroled and back on the streets was a significant factor in our not sentencing him to life in prison. In addition, because of the possibility of parole if Mr. Fullwood was given a life sentence, we did not give much consideration to the mitigating evidence. The things that Mr. Fullwood had done since being in prison were virtually meaningless because they supported a life sentence and we weren't going to give life when it meant he would be paroled and be back on the streets;

8. The jury was definitely subject to outside influences which included information that we were not provided during the trial. The outside information was used by us in our deliberations. I have not been threatened, coerced, or otherwise intimidated into making this statement. I have been given the opportunity to review this statement, to change anything that needed to be changed, and to make any additions and/or deletions I deemed proper.

Furthermore the affiant sayeth not. This the 13th day of February, 1998.

/s/
Laura Booth

STATE OF NORTH CAROLINA

COUNTY OF BUNCOMBE

Laura Booth did personally appear before me and being first duly sworn did depose and say that she had read the attached affidavit and that the information contained therein was true to the best of her knowledge.

This the 13th day of February, 1998.

/s/ John M. Purvis
Notary Public

My Commission Expires: 5/7/2002