**Dennis Waldon STOCKTON, Petitioner–Appellant,**

v.

**Edward MURRAY, Respondent–Appellee.**

**No. 94–4000.**

United States Court of Appeals, Fourth Circuit.

Argued Sept. 28, 1994.

Decided Dec. 5, 1994.

---

922

**ARGUED:** Anthony Frazier King, Howrey & Simon, Washington, DC, for appellant. John H. McLees, Jr., Asst. Atty. Gen., Office of the Attorney General, Richmond, VA, for appellee. **ON BRIEF:** Steven D. Rosenfield, Charlottesville, VA, for appellant. James S. Gilmore, III, Atty. Gen. of Virginia, Virginia B. Thiesen, Asst. Atty. Gen., Office of the Attorney General, Richmond, VA, for appellee.

Before ERVIN, Chief Judge, and WIDENER and WILKINSON, Circuit Judges.

Affirmed by published opinion. Judge WILKINSON wrote the opinion, in which Chief Judge ERVIN and WIDENER joined.

## OPINION

WILKINSON, Circuit Judge:

Appellant Dennis Stockton seeks relief from his capital murder conviction, claiming that the prosecution withheld exculpatory and impeachment evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and knowingly elicited perjured testimony during his 1983 trial. Because we find that Stockton's claims are procedurally barred, and in any event are meritless, we affirm the district court's dismissal of Stockton's petition.

### I.

A full description of the facts underlying Stockton's trial and conviction can be found in *Stockton v. Commonwealth of Virginia*, 852 F.2d 740 (4th Cir.1988), *cert. denied sub nom. Virginia v. Stockton*, 489 U.S. 1071, 109 S.Ct. 1354, 103 L.Ed.2d 822 (1989), and in *Stockton v. Commonwealth*, 227 Va. 124, 314 S.E.2d 371, 376–77, *cert. denied sub nom. Stockton v. Virginia*, 469 U.S. 873, 105 S.Ct.

229, 83 L.Ed.2d 158 (1984). We recount here only those facts relevant to the instant appeal. Briefly, eighteen-year-old Kenneth Arnder was last seen alive on July 20, 1978, in Mount Airy, North Carolina, when appellant Dennis Stockton picked up Arnder to drive him to Patrick County, Virginia. Arnder's body was discovered five days later in a remote area of Surry County, North Carolina. Arnder had been shot in the head and both of his hands had been severed above the wrists.

On June 25, 1982, Stockton was arrested and charged with the murder for hire of Arnder under Va.Code Ann. § 18.2–31(b). Stockton pleaded not guilty and was tried before a jury in the Circuit Court of Patrick County in March 1983. According to the prosecution's theory at trial, Tommy McBride hired Stockton to kill Arnder because Arnder owed McBride a sum of money from a drug transaction.

Only one witness testified at trial about the meeting at which McBride hired Stockton to kill Arnder. That witness, Randy Bowman, was imprisoned in North Carolina at the time of Stockton's trial. When asked at trial whether he had received any promises in return for his testimony, Bowman replied that he had not and insisted that he was testifying because it was "the right thing to do." Bowman did admit, however, that he "hoped" his cooperation would mitigate his sentence in some respect.

Another prosecution witness, Robert Gates, testified that Stockton had killed Ronnie Tate in 1979 because Tate had been "running [his] mouth about Kenny Arnder." The Supreme Court of Virginia upheld admission of Gates' testimony based on its conclusion that "the two offenses were interrelated, and Gates' testimony showed both Stockton's guilty knowledge of Arnder's murder and his desire to conceal his guilt." *Stockton v. Commonwealth*, 314 S.E.2d at 383. We likewise determined that admission of the testimony was not unfairly prejudicial, given the apparent link between the Tate and Arnder killings. *Stockton v. Commonwealth*, 852 F.2d at 748. The prosecution did not elicit testimony at trial about any motive for

the Tate killing other than its relation to Kenny Arnder.

After a two-day trial, the jury found Stockton guilty of murder for hire. At the sentencing phase, the same jury recommended that Stockton be sentenced to death. The trial court imposed that sentence on June 7, 1983. The Supreme Court of Virginia affirmed the conviction and sentence. *Stockton v. Commonwealth,* 314 S.E.2d at 389. The United States Supreme Court denied certiorari. *Stockton v. Virginia,* 469 U.S. 873, 105 S.Ct. 229, 83 L.Ed.2d 158 (1984). Thereafter Stockton began a lengthy quest for post-conviction relief.

This quest took the form of four habeas corpus petitions in state court and two such petitions in federal court. In the eleven years since Stockton's conviction, he has presented his claims for post-conviction relief to state and federal courts on numerous occasions. Those courts have provided a thorough and careful review of Stockton's conviction and sentence. In fact, this court previously affirmed a district court judgment vacating Stockton's death sentence and remanding for resentencing, *Stockton v. Commonwealth,* 852 F.2d at 741, where a second jury fixed Stockton's penalty at death based on the aggravating factors of vileness and future dangerousness. *Stockton v. Commonwealth,* 241 Va. 192, 402 S.E.2d 196, 207–09 (discussing aggravating factors), *cert. denied,* 112 S.Ct. 280 (1991). Stockton's remaining petitions, however, have all been dismissed. The state court's dismissal of his fourth state habeas petition is of particular interest to us in this case.

Stockton's fourth state court petition was premised upon facts revealed by a 1990 letter from the trial prosecutor. In 1982, during the course of preparation for trial, Stockton had filed a pre-trial motion asking the Commonwealth, pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), for "any and all information exculpatory in nature," and particularly for information regarding "any other person implicated in the crime charged in this case" and copies of statements made by those persons. The Commonwealth denied awareness of any such information. In February 1990, however, Stockton's counsel received a letter from the trial prosecutor that he alleges contained references to potentially exculpatory material.

The letter indicated that the prosecutor told Randy Bowman before Stockton's trial that he would endeavor to help Bowman secure a transfer to another prison.[1] A document enclosed with the letter also indicated that Gates had previously suggested an additional motive for Stockton's murder of Ronnie Tate than the one to which he testified at trial. In a statement given to North Carolina officials in 1980, Gates implied that two possible motives for the Tate murder existed: Tate's "running his mouth" about Arnder and Tate's discussion of alleged homosexual encounters with Stockton. Prior to the 1990 letter, Stockton maintains, he was unaware of this material and hence unaware of the factual bases for the instant claims.

On December 3, 1990, Stockton filed his fourth habeas petition in state court, alleging that he was entitled to a new trial on two grounds: first, that the Commonwealth failed to disclose evidence pursuant to *Brady* and *Dozier v. Commonwealth,* 219 Va. 1113, 253 S.E.2d 655 (1979), and second, that the Commonwealth knowingly elicited perjured testimony from an essential prosecution witness,

---

1. We set out here relevant excerpts from the 1990 letter:

In keeping with my previously filed response to [Stockton's] motion, I am not aware of any exculpatory evidence in this matter. In an abundance of caution, however, I am writing to disclose information which may arguably be viewed by you as mitigation evidence....

. . . .

Randy Bowman sent a letter to Jay Gregory dated March 2, 1983, in which he wrote that he would not come to court unless he could get the remaining six or seven months of his sentence curtailed. As you can see from the enclosed copy, Bowman did not write that he had been promised the sentence reduction. Actually, he closes the letter by writing that if Gregory will call Raleigh he is sure Gregory can work something out.

I am not aware of any promises made to Bowman other than that I told him that I would endeavor to see that he would be transferred. Jay Gregory told him only that he would try to help him. Of course, Bowman testified at trial that he hoped to benefit from his testimony.

Bowman, during the guilt phase of Stockton's trial. The Patrick County Circuit Court dismissed this petition pursuant to Virginia's procedural default statute, Va.Code Ann. § 8.01–654(B)(2), which provides that "[n]o writ shall be granted on the basis of any allegation the facts of which petitioner had knowledge at the time of filing any previous petition." The Virginia Supreme Court affirmed this dismissal in a written order dated June 25, 1992, agreeing with the lower court that Stockton's claims were procedurally barred. The United States Supreme Court denied certiorari. *Stockton v. Virginia,* —— U.S. ——, 113 S.Ct. 612, 121 L.Ed.2d 546 (1992).

Appellant thereafter filed the instant petition for a writ of habeas corpus in the federal district court, asserting the same claims raised in his fourth state court petition. On May 3, 1993, the Commonwealth filed a motion to dismiss the petition, arguing that the district court was barred from considering Stockton's claims because the state court had found those claims procedurally defaulted under § 8.01–654(B)(2). The district court agreed with the Commonwealth and dismissed the petition on November 29, 1993. Stockton appeals from the district court's order dismissing his petition.

## II.

■ The Supreme Court of Virginia expressly relied on a state procedural default statute, Va.Code Ann. § 8.01–654(B)(2), to find that Stockton had defaulted his present claims in state court. The state court's finding of default bars federal habeas review of those claims, absent a showing of both cause and prejudice. *Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991).

We thus turn to the question of whether there was cause to excuse the procedural default. According to *McCleskey v. Zant,* "[o]bjective factors that constitute cause include ... 'a showing that the factual or legal basis for a claim was not reasonably available to counsel.'" *McCleskey v. Zant,* 499 U.S. 467, 493–94, 111 S.Ct. 1454, 1470, 113 L.Ed.2d 517 (1991) (citing *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91

L.Ed.2d 397 (1986)); *see also Clanton v. Muncy,* 845 F.2d 1238, 1241 (4th Cir.), *cert. denied,* 485 U.S. 1000, 108 S.Ct. 1459, 99 L.Ed.2d 690 (1988) ("Cause may be established for a procedural default where an objective impediment made compliance with a procedural rule impossible, as where the factual basis for a claim was not reasonably available to counsel.").

■ Stockton urges that the Commonwealth's failure to produce the materials provided in the 1990 letter at an earlier date constitutes "cause" for his procedural default. He insists that before he received the February 1990 letter from the trial prosecutor, he was unaware of the information it contained.

We cannot agree. Findings of the state court supporting its decision to apply the procedural bar are given a presumption of correctness in determining whether cause exists to excuse the procedural default. 28 U.S.C. § 2254(d). *See Sumner v. Mata,* 449 U.S. 539, 547, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1981); *Clanton,* 845 F.2d at 1241; *Coleman v. Thompson,* 798 F.Supp. 1209, 1218 (W.D.Va.), *aff'd,* 966 F.2d 1441 (4th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 2983, 119 L.Ed.2d 600 (1992). There is ample support for the state court's conclusion that Stockton knew of, or could reasonably have discovered, the factual bases for his present claims. Stockton has failed to carry the burden assigned to him by § 2254(d) to "establish by convincing evidence that the factual determination by the State court was erroneous." 28 U.S.C. § 2254(d); *Sumner,* 449 U.S. at 550, 101 S.Ct. at 771.

First, Stockton's present claim that Randy Bowman fabricated testimony overlooks the fact that Bowman's veracity has been at issue from the inception of this case. Claims related to Randy Bowman continue to reemerge in different guises. For instance, Stockton's first state court habeas petition alleged ineffective assistance of counsel on the grounds that, among other things, trial counsel's cross-examination of Bowman failed to raise the inference "that Bowman came forward only after the Commonwealth was looking for witnesses to corroborate Stockton's [incriminating] statements, and that therefore Bowman had fabricated the story in order to give

... the authorities what they were seeking." In a similar vein, Stockton's second state court habeas petition asserted that "[s]oon after the petitioner's conviction in March of 1983, Randy Bowman admitted to other inmates at the Patrick County jail that he had committed perjury while testifying against the petitioner." Stockton's attempt to dress his old claims in new garb does not establish "cause" as defined by *McCleskey*.

Even more pointedly, evidence was available to Stockton prior to his fourth state habeas petition that Bowman claimed to have secured a "promise" from the Commonwealth in exchange for his trial testimony. In his second state court habeas petition, Stockton cited a civil action brought by him in support of his contention that Bowman admitted to other inmates that his trial testimony was perjurious. Frank Burton Cox, an inmate at the Patrick County jail, testified under oath in the proceeding cited by Stockton that "Randy said that Jay Gregory [the state investigator] and them had promised him things, you know." Not only was Stockton present when Cox testified, Stockton in fact examined Cox.

Even if Stockton had not actually raised or known of these claims previously, he still cannot establish cause to excuse his default if he should have known of such claims through the exercise of reasonable diligence. Here, it seems clear that Stockton could have marshalled the facts underlying his present claims regarding Randy Bowman's veracity in the course of investigating the factual bases of his previous claims concerning Bowman and thus could have raised the instant claims in a prior petition. *See, e.g., Waye v. Murray*, 884 F.2d 765, 766 (4th Cir.), *cert. denied*, 492 U.S. 936, 110 S.Ct. 29, 106 L.Ed.2d 634 (1989) (a finding of default under § 8.01–654(B)(2) establishes that "all of the facts on which the current petition was based were either known or available to the petitioner years ago"); *Coleman*, 798 F.Supp. at 1218. Stockton thus cannot demonstrate, as required by *McCleskey*, that the "factual or legal basis for" his claim regarding Bowman's truthfulness "was not reasonably available" to him.

■ Similarly, Stockton was aware of the existence of Robert Gates' taped statement regarding Stockton's motives for murdering Ronnie Tate as early as 1983 but chose not to investigate it further. Indeed, investigator Jay Gregory testified in a 1983 post-trial hearing that North Carolina officials had permitted him to listen to a portion of the tape. Again, reasonably diligent inquiry would have revealed the factual basis for Stockton's claim with regard to Gates' statement long before Stockton's fourth state court habeas petition.

■ Stockton also complains that the Commonwealth withheld potentially exculpatory statements by Donald York, William Roy Adkins, and Linnie Davis implicating other individuals in the Arnder murder. At most, these statements merely relate to arguments that Stockton raised in earlier habeas petitions. Moreover, the evidence Stockton claims was contained in these statements was available through other sources at the time he filed earlier petitions. The Donald York statement, for instance, relates assertions that Tommy McBride allegedly made to York. Not only did York testify at trial regarding McBride's statements to him, Stockton cannot escape the simple fact that McBride appeared as a witness on behalf of Stockton and presumably stood ready to offer whatever information he possessed upon the asking. In sum, the record amply supports the conclusion that cause did not exist to excuse the procedural default of Stockton's claims.

### III.

#### A.

■ Given the Virginia Supreme Court's finding of procedural default, we are in no way obliged to consider the merits of Stockton's claims. We do so, however, in the exercise of care and we are satisfied that Stockton's contentions lack merit. First, Stockton alleges that the government failed to correct perjurious testimony by Randy Bowman that the prosecutor had made no promises to Bowman to secure an early release or transfer to another prison. This claim is meritless. At most, the prosecutor

told Bowman that he would do what he could to help Bowman secure a prison transfer, but pointed out to Bowman that, as a Virginia prosecutor, he had no authority over matters within the North Carolina penal system. The prosecutor submitted an affidavit to this effect:

> I made it clear to Bowman at the time [prior to Stockton's trial] that I could not make him any promises; I told him I would try. I believe that I told him I would forward positive information to the North Carolina officials. As a Virginia prosecutor, I was not in a position of any authority as to matters in the North Carolina system and I so advised Bowman.

Nothing advanced by Stockton discloses the existence of any prosecutorial commitment to change the length or terms of Bowman's confinement. To the contrary, this was the very thing that the prosecution could not, and did not, promise.

We perceive only Bowman's hope that his testimony would lead to a favorable consideration of his circumstances. The sum and substance of this hope was communicated to the jury by the entirety of Bowman's testimony:

DIRECT EXAMINATION:

COMMONWEALTH: Randy, Have an—Have any promises been made to you in return for your testimony here this morning?

BOWMAN: No, sir.

. . . .

Q: ... Why are you testifying here today?

A: I must feel it would be the right thing to do.

Q: You feel it would be the right thing to do. Any other reason?

A: Uhmm–I hope it may help.

Q: You hope it may help in what respect?

A: Well, get out sooner or something, I guess.

Q: So, that's one—another one of rhe [sic] reasons why you're testifying here today, is that correct?

A: Yea.

Q: And, also, because you feel it would be the right thing to do.

A: Yea. I don't ...

Q: All right.

A: I don't really have much time left, so, it can't help me much.

. . . .

CROSS–EXAMINATION:

Q: And I believe that, ah, you told Mr. Giorno that no promises were made to you about your testimony here.

A: That's right.

Q: But one promise was made to you wasn't it. That they would do all they could to see that you got consideration for this testimony.

A: Well they—I was hoping to get some consideration out of it, yea.

Q: And they promised you that they'd do all they could to see that you got what consideration you could get.

A: Naw, they didn't make any promises.

Q: Well, they didn't promise you that the Judge would do this or the Judge would do that but they gave you their word that they would help you in any way they could to see that you got what consideration you could for your testimony, isn't that a fact?

A: They told me that they couldn't make any promises. Said they didn't know if they could help me or not.

Q: You were told you would get your consideration on pending charges and you thought you would get consideration on pending charges, isn't that a fact?

A: I was hoping to, yea.

Bowman's testimony was not perjurious. He responded to questioning with an accurate description of his understanding with the prosecution: while no commitments were made to him, he still hoped that his cooperation would help reduce the length or alter the terms of his incarceration. The jury was apprised that Bowman "was hoping to get some consideration out of" his testimony, but that there was no guarantee that he would. In short, Bowman's testimony did not deprive Stockton of his right to a fair trial.

For similar reasons, Stockton's claim that he is entitled to relief under *Brady* based on the prosecution's failure to turn over Bowman's 1983 letter to the trial prosecutor must also fail. Stockton claims that the letter suggests that Bowman conditioned his testimony on elimination of the remainder of his sentence and that the Commonwealth in fact offered Bowman a "deal" in return for his testimony. To the contrary, the plaintive tone of Bowman's letter indicates that no promise had been made to reduce Bowman's sentence.[2] Moreover, Stockton has pointed to no evidence in the record that the prosecution acceded at any point to Bowman's demands for a reduction in his sentence. Bowman's letter thus does not fall within the contours of *Brady*. Failure to turn the letter over to the defense before trial cannot provide grounds for the relief Stockton seeks.

### B.

Stockton's second *Brady* claim concerns the Commonwealth's failure to disclose the Robert Gates statement. Stockton contends that Gates' 1980 statement, by revealing dual motives for Stockton's murder of Tate, conflicted with Gates' testimony at trial and should have been turned over under *Brady*. This claim fails for three reasons.

First, *Brady* does not compel the disclosure of evidence available to the defendant from other sources, including diligent investigation by the defense. *United States v. Wilson*, 901 F.2d 378, 380 (4th Cir.1990). As we have previously discussed, Stockton was aware of the Gates tape as early as 1983, when investigator Gregory testified in a post-trial hearing that he had listened to "[a] very short segment" of the taped statement. Stockton chose not to pursue Gates' statement any further, and cannot now seek relief from his conviction under *Brady* because the statement did not fall into his lap before the prosecution's 1990 letter. If we were to hold that Stockton's claim amounts to a violation of *Brady*, we would create the risk that *Brady* could dull the adversarial process and render the prosecution the gatherer of all evidence necessary to preparation of a defendant's case. Aware of the existence of potentially exculpatory information, a defendant cannot sit idly by in the hopes that the prosecution will discover and disclose that information and, when the prosecution does not do so, seize upon the prosecution's conduct as grounds for habeas relief. *See, e.g., Lugo v. Munoz*, 682 F.2d 7, 9–10 (1st Cir. 1982).

Second, the Gates statement is not clearly exculpatory. Gates' taped statement mentions both Tate's comments about Arnder and Stockton's alleged homosexual activities with Tate as motives for the Tate murder. The existence of one motive does not foreclose the other. Were Stockton to have argued the contents of Gates' statement in its entirety to the jury, the jury nonetheless could have concluded that Stockton killed Tate at least in part to silence him about the murder of Kenny Arnder. When considered in its entirety, it is clear that the Gates statement in fact confirms a link between the Tate and Arnder murders.

Finally, investigator Gregory claims in an affidavit that he relayed the substance of Gates' statement to Stockton's counsel before trial. Stockton does not directly dispute the affidavit, but contends generally that he was unaware of the entirety of Gates' statement until the prosecutor's 1990 letter. Whether or not Stockton possessed the information, it is difficult to envision how Gates' full statement would have assisted Stockton's case. Stockton's alleged homosexual activities with Tate had the potential to seriously prejudice the jury. Had the Commonwealth in fact introduced evidence of this additional motive for the Tate murder, Stockton likely would have moved for a mistrial. *See, e.g., United States v. Ham*, 998 F.2d 1247, 1252 (4th

---

2. Bowman's letter reads as follows:

Hi Mr. Gregory.

I'm writing you to let you know that I'm not going to court unless you can get this 6 or 7 months I've got leaf [sic] cutoff [sic] where I don't have to come back to prison. I've got a bunch of problems but I can't tell you about them now. I don't have to tell you how searious [sic] this is. I'll probley [sic] get killed over this anyway and I think I deserve to get out of prison before I do. Mr. Gregory if you'll call Raleigh and explain to them how searious [sic] this thing is I'm sure you can work out something.

928

Cir.1993) ("[I]mplications of ... homosexuality ... unfairly prejudice a defendant.") (footnote omitted); *United States v. Gillespie,* 852 F.2d 475, 479 (9th Cir.1988) ("Evidence of homosexuality is extremely prejudicial."). For all the reasons discussed above, Stockton's *Brady* claim with respect to Robert Gates' statement lacks merit.

## IV.

In · conclusion, we are persuaded that Stockton's trial and resentencing were fair, and we see no reason to doubt the soundness of the jury's verdict. The post-conviction process in this case has been lengthy, and Stockton has had multiple opportunities to present his claims for habeas relief to state and federal courts. The district court's dismissal of his petition is hereby

*AFFIRMED.*