# CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE

Commonwealth of Virginia

> v.

George W. Huguely, V

August 15, 2012

Case No. 11-102

By Judge Edward L. Hogshire

On June 5, 2012, defendant George W. Huguely, V, by counsel, filed a Supplemental Motion to Set Aside the Verdict and For a New Trial. *See* Def.'s Supp. Mot. For New Trial. Mr. Huguely claims the Commonwealth failed to disclose favorable and material evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Specifically, Mr. Huguely alleges that before his trial, the Commonwealth was aware that the victim's mother and sister, Mrs. Sharon D. Love and Ms. Alexis D. Love ("the Loves"), respectively, had engaged a civil attorney and were specifically preparing to sue Mr. Huguely and that their civil attorney was having contact with the Commonwealth's Attorney, Mr. Warner D. Chapman, Esq. Def.'s Supp. Mot. for New Trial 2. Mr. Huguely seeks an evidentiary hearing to determine the scope of any *Brady* violation. *Id.* at 4. Briefs were filed by both sides, and an *ore tenus* hearing was conducted on July 31, 2012. Following that hearing, the Commonwealth and defense counsel submitted additional case authorities and arguments for review. *See generally* Def.'s

Supp. Mem. on *Brady* Issues; Def.'s Second Proffer of Evidence Relating to *Brady* Disclosures; Comm. Supp. To R. Relating to Def.'s *Brady* Mot. Having considered all the aforementioned materials and for the reasons set forth below, the Court denies Mr. Huguely's motion for an evidentiary hearing.

## I. *Procedural Summary*

On April 18, 2011, a grand jury indicted Mr. Huguely on charges of first degree premeditated murder, felony murder, robbery, grand larceny, and two counts of breaking and entering, in connection with the death of Yeardley Love. The trial began on February 6, 2012, and concluded on February 23, 2012, with the jury finding Mr. Huguely guilty of second degree murder and grand larceny and recommending a sentence of twenty-five years in the penitentiary for the former and one year to serve for the latter. On April 26, 2012, Mrs. Love, acting as Administrator of the Estate of Yeardley R. Love, Deceased, filed a civil action against Mr. Huguely in Charlottesville Circuit Court. Compl., *Love v. Huguely*, No. 2012-130 (Va. Cir. Apr. 26, 2012). Alternative counts were included in the Complaint, three of which allege that Mr. Huguely's negligence caused the death of the victim. *Id.* at 2-3. Notably, Count Four of the Complaint alleges that Mr. Huguely "willfully and maliciously caused the injuries and/or death of [Yeardley] Love." On May 25, 2012, defense counsel in the criminal case filed a Motion to Set Aside the Verdict and for a New Trial, with final argument on this motion scheduled for August 22, 2012. *See* Def.'s Mot. for New Trial.

## II. *Summary of Facts as Adduced at Hearing of July 31, 2012, as Supplemented*

Sometime in July 2011, Mr. Chapman received a telephone call from Mahlon G. Funk, Esq., an attorney retained by the Loves. *See* Hr.'g Tr. July 31, 2012, Ex. B (hereinafter "*Chapman Letter II*, May 25, 2012"). On August 17, 2011, Mr. Chapman received an email from Irvin W. Cantor, Esq., Mr. Funk's law partner. Hr.'g Tr. July 31, 2012, Ex. F (hereinafter "*Cantor Correspondence*, Aug. 17, 2011"). Mr. Cantor wrote: "As you know from your conversation with [Mr. Funk], we are planning to file the civil suit on behalf of the Love family against Huguely." *Id.* Mr. Cantor requested a meeting with Mr. Chapman the following week "to discuss the lawsuit." *Id.*

On January 30, 2012, one week before Mr. Huguely's criminal trial was scheduled to begin, Mr. Chapman sent defense counsel a letter informing them that the Loves "will be called as witnesses during the Commonwealth's case," and that "[w]hile no civil proceeding has been filed as a result of the death of Yeardley Love, a potential cause of action may be available

to either or both [sic] them under the circumstances." Hr.'g Tr. July 31, 2012, Ex. A (hereinafter "*Chapman Letter I*, Jan. 30, 2012"). Ultimately, the Loves did not testify during the guilt or innocence phase of the trial but did testify during the sentencing phase. The defense did not cross-examine either of the Loves at trial.

On April 19, 2012, a hearing was held in Charlottesville Circuit Court to determine the status of exhibits and trial materials. At that hearing, Mr. Funk stated that the Loves "have complied with the Commonwealth's Attorney's every request, including that they hold any and all civil proceedings and any investigations . . . until after the criminal trial was over." Hr.'g Tr. 45-46, Apr. 19, 2012. Mr. Funk also referenced an "almost two year[]" relationship with the Loves. *Id*. at 46. In reference to Mr. Chapman, Mr. Funk stated that "he's dealt with us on the up and up, and my clients, he has dealt with immaculately for two years." *Id*. at 48.

Following this hearing, defense counsel Francis McQ. Lawrence, Esq., sent a letter to Mr. Chapman stating that "Mr. Funk's statements in open court seem to indicate that the Commonwealth was aware that [civil] counsel had been engaged and that a [civil suit] would be brought," and that such knowledge is "far different" from what was revealed in Mr. Chapman's January 30, 2012, letter (namely that a "potential cause of action" may be available to the Loves). Hr.'g Tr. July 31, 2012, Ex. C (hereinafter "*Lawrence Letter*, May 18, 2012"). Mr. Lawrence also claimed that, had defense counsel known of the "imminent" civil suit, their "decision as to whether and how to cross-examine [the Loves] would have been influenced." *Id*.

Mr. Chapman responded to Mr. Lawrence in a letter dated May 25, 2012. *Chapman Letter II*, May 25, 2012. He described receiving an unsolicited telephone call from Mr. Funk "shortly before Mr. Cantor's email," but that, "[s]o far as I can recall, I had never met [Mr. Funk] and did not meet him until after the [criminal trial]." *Id*. Mr. Chapman also stated that "I do not recall having had any personal contact with Mr. Cantor until after the criminal trial." *Id*.

In Defendant's Second Proffer of Evidence Relating to *Brady* Disclosure, filed August 13, 2012, the defense submitted a copy of communication directed to the attorneys representing Mrs. Love in the pending civil case, asking them to provide information about the plans to file suit. Def.'s Second Proffer of Evidence Relating to *Brady* Disclosure. Defense counsel posed five questions seeking to inquire about the suit, including questions as to when these attorneys were first contacted, when any retainer agreement was executed, the date the initial complaint was drafted, and when language in the complaint regarding negligence was formulated. *Id*. To date, there has been no response to these inquiries filed with the Court.

Finally, in a document entitled Commonwealth's Supplement to the Record Relating to Defendant's *Brady* Motion, also filed August 13,

2012, the Commonwealth submitted quotes from the court reporter's log from an exchange between the Court and Mr. Lawrence at the hearing on July 31, 2012. Comm. Supp. to R. Relating to Def.'s *Brady* Mot. When defense counsel made reference to the letter of January 30, 2012, from Mr. Chapman to defense counsel, the Court made the following comment: "Right now the defense is on notice that a lawsuit is coming," adding that "you were anticipating a lawsuit," to which defense counsel responded, "not yet." *See id.* The Commonwealth asserts that this quotation confirms that as of January 30, 2012, "a civil suit against the defendant was actually anticipated by the defense." Comm. Supp. to R. Relating to Def.'s *Brady* Mot. 2.

### III. *Summary of Claims by Defendant Supporting Brady Motion*

Defense counsel assert that, based on disclosures by the Commonwealth, they were only aware that there was a "potential cause of action" against Mr. Huguely when the Commonwealth knew before trial that the Loves had retained counsel and were planning to file a lawsuit. Def.'s Supp. Mot. for New Trial 3. It was not until after the hearing on April 19, 2012, when Mr. Funk recited that he had a "long standing, ongoing relationship with Mr. Chapman" that defense counsel, for the first time, in a letter dated May 18, 2012, made an inquiry about the status of the civil case. *Lawrence Letter*, May 18, 2012. Defense counsel argue that, despite the civil suit not being filed until over two months after the conclusion of the criminal trial, the information regarding its status was material to impeach the testimony of both Sharon and Alexis Love, "especially in the penalty phase of trial." Def.'s Supp. Mot. for New Trial 3-4. They also assert that Mr. Chapman "may well have known not only that a civil suit was in the works, but that the civil suit included allegations fundamentally inconsistent with the prosecution's theory, namely allegations that [Yeardley] Love's death was an accident." *Id.* at 4. In addition, defense counsel state that they had "no ability to investigate the extent to which other witnesses may have been influenced by having received information from either the Loves or the Loves' attorneys that a civil claim was actively being developed" and that "[t]hese were not matters that the defense could have discovered through reasonable independent investigation." *Id.*

Significantly, in none of the pleadings or arguments of defense counsel is there an assertion or claim that any attempt to inquire into the status of a civil action against Mr. Huguely was made until the letter of May 18, 2012. In Defendant's Supplemental Memorandum on *Brady* Issues, defense counsel assert that their reason for not contacting the Love family directly was that the "Commonwealth itself took the position throughout the criminal proceedings that any contact between the defense and the Love family would have been inappropriate, and the defense respected

that request." Def.'s Supp. Mem. on *Brady* Issues 2. Defense counsel has not claimed that the defense made any attempt prior to trial to question anyone or to investigate any source to determine the status of any possible civil suit. Defense counsel has not alleged any other deficiencies in the Commonwealth's implementation of its open file policy nor does counsel suggest that there was any information sought by the defense that was unreasonably refused by the Commonwealth or that any exculpatory information was deliberately hidden or concealed from the defense.

Indeed, the gravamen of the pending *Brady* motion is that, "given the sharply disputed facts about the nature of the Commonwealth's interaction with the Loves' civil attorneys, Mr. Huguely has a right to an evidentiary hearing to further develop the evidence and his rights under *Brady*." Def.'s Supp. Mem. on *Brady* Issues 2. The defense is seeking a hearing to determine exactly what the Commonwealth knew about the pending civil action and when the Commonwealth obtained any information it had. Defense counsel maintain that the letter of January 30, 2012, from Mr. Chapman stating that the Loves had a "potential cause of action" suggested that the Commonwealth had no further information about the civil suit, characterizing that statement as "not just incomplete, but an affirmative misrepresentation." *Id.* at 8.

## IV. *Question Presented*

The question presented is whether the facts cited above are sufficient to mandate an evidentiary hearing to determine the existence and scope of any *Brady* violation.

## V. *Legal Standard: Brady v. Maryland*

In *Brady v. Maryland*, 373 U.S. 83 (1963), the defendant and an accomplice were charged with first degree murder. Prior to trial, defense counsel asked the prosecution to allow him to examine the accomplice's extrajudicial statements. Several statements were provided, but one in which the accomplice admitted the actual homicide was withheld by the prosecution and was not discovered by the defendant until after he had been sentenced to death. Reversing, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.

In the forty-nine years since *Brady*, a substantial amount of case law has been devoted to further defining what constitutes "suppression" by the prosecution, what makes evidence "favorable," and how "favorable" evidence differs from "material" evidence, if at all. *United States v. Agurs*,

427 U.S. 97 (1976) (noting that "the prudent prosecutor will resolve doubtful questions in favor of disclosure," but that, "to reiterate a critical point, the prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial"), addressed the "suppression" element and expanded *Brady* and *Bagley* by disposing of any need for the defendant to affirmatively request the evidence in question. *United States v. Bagley*, 473 U.S. 667 (1985) (involving the prosecution's failure to disclose monetary payments made to witnesses despite a discovery motion filed by the defendant requesting such information), held that both exculpatory and impeachment evidence are "favorable," but that to be considered "material" there must be a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.

## VI. *"Reasonable Diligence" in Virginia*

Many courts have denied *Brady* claims on the ground that the defendant could have discovered the evidence through "reasonable diligence" or "due diligence." Some of these have found that evidence cannot be considered "suppressed" if the defendant knows or should know how to acquire it independently. *See, e.g., United States v. Brown*, 650 F.3d 581, 588 (5th Cir. 2011). Others have found such a requirement generally without specifically discussing the suppression prong. *See, e.g., United States v. Wilson*, 901 F.2d 378, 381 (4th Cir. 1990) (noting that, "where the exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the *Brady* doctrine"); *United States v. Grossman*, 843 F.2d 78, 85 (2d Cir. 1988) (finding no *Brady* violation when the defendant "knew or should have known the essential facts permitting him to take advantage of any exculpatory evidence"); *United States v. Davis*, 787 F.2d 1501, 1505 (11th Cir. 1986) (stating "the *Brady* rule does not apply if the evidence in question is available to the defendant from other sources").

The rationale behind a "reasonable diligence" requirement was summarized nicely by Judge J. Harvey Wilkinson in *Stockton v. Murray*, 41 F.3d 920 (4th Cir. 1994). Being "[a]ware of the existence of potentially exculpatory information, a defendant cannot sit idly by in the hopes that the prosecution will discover and disclose that information and, when the prosecution does not do so, seize upon the prosecution's conduct as grounds for habeas relief." *Id.* at 927. This is consistent with the purpose of the *Brady* rule "not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur." *United States v. Bagley*, 473 U.S. 667, 675 (1985).

Mr. Huguely contends that recent *Brady* cases have done away with a "reasonable diligence" requirement. Def.'s Supp. Mem. on *Brady* Issues

3-5. Noting the Commonwealth's open file policy, Mr. Huguely cites *Strickler v. Greene,* where the Supreme Court stated, "if a prosecutor asserts that he complies with *Brady* through an open file policy, defense counsel may reasonably rely on that file to contain all materials the State is constitutionally obligated to disclose under *Brady.*" 527 U.S. 263, 284, and n. 23 (1999). At issue in *Strickler* was evidence that could have been used to impeach a prosecution witness. The Commonwealth argued that the evidence was not *Brady* material because an examination of the witness's testimony and a letter published in the local newspaper would have made it clear to defense counsel that the witness had had several interviews with police, which in turn would have led a diligent counsel to discover the police files that contained the impeachment evidence. *Strickler,* 527 U.S. at 284. The Supreme Court did not find this reasoning persuasive, stating "it by no means follows" that knowing about the interviews between the witness and police would have alerted counsel that the records of those interviews and notes sent to police by the witness existed and had been suppressed, *Id.* at 285, that is, the Supreme Court did not dispose of a "reasonable diligence" inquiry, but simply concluded that some greater level of diligence would have been needed to uncover the evidence under the particular facts of the case.

The language from *Strickler* regarding a prosecutor's open file policy was cited with approval by the Supreme Court of Virginia in *Workman v. Commonwealth,* 272 Va. 633 (2006), and *Workman* is cited by Mr. Huguely in his brief. Def.'s Supp. Mem. on *Brady* Issues 4. *Workman* involved a defendant who was convicted of voluntary manslaughter after shooting a man who assaulted him along with an accomplice. After trial but before sentencing, the defendant learned of previous undisclosed statements made by witnesses to police that directly supported his self-defense claim. *Workman,* 272 Va. at 640. The first statement, which led to the other statements, was obtained by police during the investigation of an unrelated case and never became part of the investigative file in the *Workman* case. *Id.* at 647. The Supreme Court of Virginia found that "under *Strickler,* [the defendant] cannot be faulted for relying on the Commonwealth's open file policy and cannot, *on these facts,* be found to have failed to exercise reasonable diligence." *Id.* at 649 (emphasis added). Unlike in *Workman,* where the Commonwealth's Attorney and the police are both governmental entities expected to coordinate their activities, in the instant case the Commonwealth has no authority over private civil attorneys retained by the Loves. Moreover, *Workman,* in relying on *Strickler,* retains a "reasonable diligence" requirement.

Other recent Virginia cases have affirmed the "reasonable diligence" requirement. *See Porter v. Warden of Sussex I State Prison,* 283 Va. 326, 332 (2012) (stating that, "pursuant to *Brady,* there is no obligation to produce information available to the defendant from other sources, including diligent

investigation by the defense"); *Fullwood v. Lee*, 290 F.3d 663, 686 (4th Cir. 2002) (affirming the holding from *Stockton v. Murray*, 41 F.3d 920, 927 (4th Cir. 1994), that the *Brady* rule "does not compel the disclosure of evidence available to the defendant from other sources, including diligent investigation by the defense"). *See also Thornton v. Commonwealth*, 2000 Va. App. LEXIS 794 (Va. App., Dec. 5, 2000); *Gagelonia v. Commonwealth*, 52 Va. App. 99 (2008). The above-mentioned cases clearly illustrate that the "reasonable diligence" requirement is alive and well in Virginia.

## VII. *Analysis*

Looking first at the exculpatory value in cross-examining Mrs. Love about her imminent plans to file a civil suit, certainly skilled defense counsel, depending on the answers to the questions posed to Mrs. Love, could have been able to raise that factor as mitigation in arguing to the jury during the sentencing phase of the case. The value to the defense in questioning the Loves about the differing theories between the criminal case and the planned civil suit is impossible to determine in the abstract, but is not likely to have resulted in any exculpatory affect in any phase of the trial. Looking next to the materiality prong of *Brady*, it is clear that nothing about this civil case would have influenced the guilt or innocence phase of the criminal trial. Questioning of the victim's mother about plans to sue and about raising money for a foundation dedicated to the memory of her daughter and other related issues may have inspired some sympathy for Mr. Huguely or may have done just the opposite. It is doubtful that had the defense been provided more information the result would have been different, and it cannot be said that, for this reason, Mr. Huguely was deprived of a fair trial.

But even if there can be found that there was an otherwise-valid *Brady* claim, this claim is not actionable when the defendant fails to exercise "reasonable diligence." It cannot be said in this case that defense counsel exercised reasonable diligence in attempting to discover the status of the Loves' potential civil suit against Mr. Huguely. Prior to trial, on October 25, 2011, defense counsel submitted materials to the Court as part of a Motion to Sequester Jurors from which counsel could infer the high likelihood of the Loves filing a civil suit. *See* Def. Mot. to Sequester. These materials included information regarding the establishment of the One Love Foundation ("the Foundation"), formed to honor the memory of Yeardley Love. *Id.* at 11. Several events were held around Charlottesville to raise money for the Foundation, and a fund was created with the goals of building the Yeardley Reynolds Love Turf Field and establishing a scholarship in her name. *Id.* Defense counsel were clearly aware of the substantial and ongoing fundraising by the Foundation. Additionally, the defendant submitted hundreds of news stories in support of his Motion to

Sequester Jurors in light of significant pre-trial publicity, and many of these referenced the defendant's family's socio-economic status and wealth. *See id.* at Ex. A. This information reasonably relates to the ability of the defendant and/or defendant's family to pay a substantial civil judgment. Accepting as true defense counsel's assertion that information regarding an "imminent and certain" civil proceeding would have affected their cross-examination strategy, *Lawrence Letter*, May 18, 2012, this information should have led defense counsel to inquire further into the status of any civil proceeding.

Mr. Chapman alerted the defendant in his January 30, 2012, letter that "a potential cause of action may be available" to the Loves. *Chapman Letter I*, Jan. 30, 2012. In light of the fact that the suit was not filed until long after the criminal trial had concluded, to say anything further would have been little more than conjecture at that stage. Even if Mr. Cantor's email is correct in that Mr. Chapman knew of the Loves' plan to file a civil suit following his conversation with Mr. Funk, *Cantor Correspondence*, Aug. 17, 2011, until the suit is filed, all that exists is "a potential cause of action." The communication of January 30, 2012, regarding the "potential cause of action," coming as it did near the date of trial, rather than being seen as a "misrepresentation" as portrayed by the defense could as easily be seen as a "red flag." The defense was well aware that the two year statute of limitations for this type of suit was drawing nigh. As such, the letter could be viewed as a reminder of the obvious, i.e., that like other criminal assault cases involving defendants who are seen as having substantial assets, a civil suit is likely to be filed seeking a substantial monetary award as redress. Moreover, *Brady* and its progeny establish a duty only for the prosecutor to disclose evidence known by those *"acting on the government's behalf."* *See Strickler v. Greene*, 527 U.S. 263 (1999) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)). The Commonwealth has no authority and no control over private civil attorneys and, therefore, no corresponding obligation.

The defendant maintains that even "reasonable diligence" would not have uncovered the Loves' plan to file a civil suit, citing the Commonwealth's policy of discouraging defense counsel from contacting victims' families. Def.'s Supp. Mem. on *Brady* Issues 5. The Court does not find this reasoning persuasive. A criminal defendant has the right "to call for evidence in his favor," Va. Const., art. I, § 8 (2012), including "the right to interview material witnesses and to ascertain the truth." *Bobo v. Commonwealth*, 187 Va. 774, 779 (1948). Before trial, defense counsel succeeded in processing a subpoena for medical records from the Love family after initiating contact through the Commonwealth. Other inquiries relating to the possibility of participating in a restorative justice process were made as well. The defendant clearly had both the right and the ability to inquire as to the status of any civil proceedings against him, either directly though the Loves or with the help of the Commonwealth. There is no allegation that the

Commonwealth barred the defense from posing questions to the victim's family regarding matters critical to the defense. A simple inquiry directed to the Love family regarding the name of any attorney handling civil matters may have sufficed, leading to full knowledge of any plans to file suit. The defense's decision not to initiate contact with the Love family was a tactical decision not fueled by any improper attempts to conceal or obfuscate by the Commonwealth. In addition, inquiries could have been made with persons who would have been part of the investigation of the civil case, including police, lay witnesses, and prominent personal injury attorneys in the area as to their knowledge of a planned civil suit. The record is devoid of any evidence showing that *any investigation* was conducted prior to trial into the existence of plans to sue, the cause of action anticipated, or the amount sought in damages.

Without question, had defense counsel believed prior to trial that information about an imminent civil suit would have aided the defense, they would have devoted significant time and resources to ascertain all they possibly could about this suit. Their inaction in this regard speaks to their strategic assessment only, not to any *Brady* violation.

For the above-stated reasons, the defendant's Motion for an Evidentiary Hearing must be denied.